**FIRST HOME SAVINGS BANK, Plaintiff–Respondent,**

**v.**

**C & L FARMS, INC., and Larry & Inez Harrison, Defendants and Dale & Glendora Martin, Defendants–Appellants.**

**No. 21913.**

Missouri Court of Appeals, Southern District, Division Two.

July 14, 1998.

Motion for Rehearing and Transfer Denied Aug. 4, 1998.

Application to Transfer Denied Sept. 22, 1998.

---

Brad D. Eidson, Houston, for Appellants.

Harold F. Glass, Millington & Glass, Springfield, for Respondent.

PARRISH, Presiding Judge.

This is an appeal of a judgment declaring a conveyance of real estate by C & L Farms, Inc., to Dale Martin and Glendora Martin fraudulent pursuant to § 428.020, RSMo 1986 (repealed effective August 28, 1992).[1] This court affirms in part, reverses in part and remands.

### Transactions Between the Reeds and First Home Savings Bank

In 1984 Charles Reed and Lois Reed obtained a loan of $100,000 from The Home Building and Loan Association of Mountain Grove, Missouri, (now First Home Savings Bank, referred to herein as "bank") for use as operating capital for their cattle and farming business. The loan was secured by a deed of trust on 200 acres of real estate in

---

1. *See* H.C.S.S.B. 448, 1992 Mo.Laws @ 953. § 428.020, RSMo 1986, is applicable to this case since it was in effect at the time the transaction occurred. *Dickinson v. Ronwin,* 935 S.W.2d 358, 362 n. 4 (Mo.App.1996). References in this opinion to § 428.020 are to RSMo 1986.

Wright County, Missouri, that they acquired from Mr. Reed's mother.

In March 1989 the Reeds formed a corporation, C & L Farms, Inc. (the corporation). They conveyed three tracts of real estate to the corporation, including the Wright County property that secured their loan from bank. After the corporation was formed, the Reeds negotiated an extension agreement with bank. The balance then owed was $74,955.51. Bank loaned Mr. and Mrs. Reed an additional $25,044.49. A loan agreement evidencing the additional amount and an extension agreement were executed. The agreements increased the rate of interest and extended the term of the promissory note to December 31, 2009.[2] Bank required the new loan agreement and the extension agreement to be executed by the Reeds individually and on behalf of the corporation as its president and secretary.

Before they formed the corporation, the Reeds were engaged in buying and selling cattle and farming. After the corporation was formed, they conducted the cattle and farming business through it.

### The Corporation

The corporation lost money in 1990 and 1991. Minutes of annual meetings of the board of directors for 1990 and 1991 were admitted in evidence. The meetings were held on the last day of the year. Minutes of the 1990 meeting state, "Treasures [sic] report stated that our income was $3,402,344.00 for the year. The expenses totaled $3,387,-840.00 with depr of $15,656 for a total net income of <1152>." The minutes state that the possibility of selling land was discussed.

The 1991 minutes state, "Treasures [sic] report showed that our total sales were $3,095,895 for the year[.] Total expenses were $3,083,990[.] Depr in the amount of $9109 for a net income of <2804>[.]" They state, "Sold two pieces of land 85A. and 10A. in Wright County, Mo." The minutes report that sale of additional land was discussed in the event business did not improve.

The corporation conveyed the 200-acre tract of real estate that the Reeds acquired from Mr. Reed's mother to Dale Martin and Glendora Martin by warranty deed dated January 15, 1992. The deed was executed by Charles Reed and Lois Reed as president and treasurer, respectively, of the corporation. Their signatures were notarized March 31, 1992. The deed was filed for record April 6, 1992.

Mr. Reed testified that he approached two other prospective buyers. He first offered the real estate to Raymond Woods for $150,-000. Mr. Woods declined and counteroffered $110,000. Mr. Reed then offered the land to Leon Top for "around 120,000." Mr. Top declined but offered to pay $500 an acre.

Mr. Reed told the trial court that he and Mr. Martin "had a cattle transaction business about that time and [he] told him [he] was going to sell." He was asked the following questions and gave the following answers:

Q. All right. Now, the agreement between Dale Martin and you is that he would pay you $125,000 for this land; is that correct?

A. Yes.

Q. Now, through your business deal you already owed him—when I say you, I mean C & L Farms, Inc., already owed him [$]25,000?

A. Yes. We just had some cattle operations ahead of that and I kept some of the cattle, and therefore, I still owed him some money on the cattle which was around [$]25,000.

Q. It was a debt?

A. Yeah.

. . .

Q. And the only other debt of C & L Farms, Inc. was to the Plaintiff here, First Home Savings Bank?

A. Yes.

Q. There were two debts; is that right?

A. Yes. Uh-huh.

---

2. The promissory note provided for a variable rate of interest. The annual rate of interest was reviewable, pursuant to the terms of the note, annually in December. The extension agreement changed the "original review month" from December to May.

Q. And when you decided to sell the farm to Dale Martin you were going to be in a position to satisfy both debts?

A. Right.

Q. Dale Martin agreed to extinguish that $25,000 debt; is that correct?

A. Yes.

Q. And he agreed to pay you $100,000 in—in money, in cash?

A. Yes.

Mr. Martin endorsed and gave to Mr. Reed a check payable to "Martin Farms" in the amount of $79,736.62 and gave his personal check in the amount of $20,263.38. The $79,736.62 check was deposited in the Reeds' personal checking account with bank. Bank was then paid $85,000 from the account to satisfy the balance owed on the debt secured by the deed of trust on the real estate the Martins were buying. The deed of trust was released and later delivered to the Reeds. The Reeds, on behalf of the corporation, executed and delivered a warranty deed from the corporation to the Martins.

The same day the Reeds signed and delivered the corporation's deed to the Martins, March 31, 1992, Charles Reed, Lois Reed, Dale Martin and Glendora Martin signed a writing entitled "Contract for Deed" that provided for the Martins to convey the property they acquired from the corporation to the Reeds upon payment of the sum of $125,000. It further provided that the Reeds were to pay interest at the rate of 8% per annum payable "yearly on Janurary [sic] 15th." The instrument stated, "The full amount of the contract price shall be paid within Twenty (20) years from this date."

Mr. Martin testified that the "Contract for Deed" reflected his agreement with the Reeds. He explained, "If they was ever able and liable they had first chance to buy it back." He permitted the Reeds to remain on the property. They paid the insurance on the house and the taxes on the real estate.

### The Central Production Credit Association Debt

Central Production Credit Association (CPCA) held a promissory note signed by Charles N. Reed and Lois Reed in the face amount of $331,472.54. It was dated March 10, 1986. On August 28, 1989, CPCA filed suit to collect the unpaid balance of the note, $158,725.24, plus accrued interest. The case was tried March 26, 1990. Judgment was entered in favor of the Reeds. CPCA appealed. The judgment was reversed and remanded with directions to enter judgment for CPCA. See *Central Production Credit Ass'n. v. Reed*, 805 S.W.2d 300 (Mo.App. 1991). Upon remand the trial court entered judgment for CPCA in the amount of $165,460.19 together with interest thereon at the rate of 9% per annum effective March 26, 1990.[3]

### Check Kiting and the Bank's Losses

In November 1995 several of the corporation's checks on an account in the Bank of Mansfield were written to Show Me Cattle. "Show Me Cattle" was the name under which Larry Harrison and Inez Harrison did business. They maintained a checking account with bank in which they deposited the checks. The checks were routed to the Bank of Mansfield for payment. The checks were returned as either insufficient funds or uncollected funds.

During the period between the deposit of the checks by the Harrisons and the return of the checks, the Harrisons had withdrawn funds the dishonored checks represented from bank. During the same period of time, the Harrisons were writing checks to the corporation on their account with bank. Bank failed to collect $80,339.45 it paid out in

---

**3.** *Central Production Credit Ass'n. v. Reed* explains the history of the promissory note that was the basis for its suit:

The promissory note sued upon was signed March 10, 1986. [Reeds] admit that they signed it on or about that date. [Reeds] had borrowed money from plaintiff for several years previously and the debt represented by

that note goes back to at least August 5, 1985. A previous note was signed on that date by [Reeds] and secured by a deed of trust of even date. The promissory note of March 10, 1986, stated that it was "secured ... by real estate mortgage/deed of trust dated" June 25, 1984 and August 5, 1985.

805 S.W.2d at 301.

reliance on the unpaid checks of the corporation deposited by the Harrisons.[4]

### The Judgment on Count III

The trial court found that the conveyance by the corporation to Dale Martin and Glendora Martin was fraudulent. It declared that the Martins had a lien on the property. The trial court ordered:

. . .

2. The property shall be sold at public auction within 45 days from the date of entry of this Judgment under the terms and conditions agreed upon by [bank] and defendants Martin; . . . .

3. Upon sale of the property, the proceeds shall be distributed as follows:

(a) *First,* to the expenses of the sale;

(b) *Second,* to defendants Martin to satisfy their lien of $100,000.00 plus interest at the rate of eight percent (8%) per annum from April 6, 1992, to January 24, 1996;

(c) *Third,* to [bank] up to $82,284.78 plus interest at 9% from July 25, 1997, to the date of the sale; and,

(d) *Fourth,* the remaining balance, if any, to [the corporation].

. . .

### The Appeal

Dale Martin and Glendora Martin appeal. Their first point asserts that the trial court erred in finding the conveyance from the corporation to them was fraudulent; that there was no substantial evidence to support the finding; it was against the weight of the evidence; it erroneously applied or declared the law. They contend (a) § 428.020 prohibited bank from questioning the corporation's right to convey its real estate absent evidence that the corporation owed debts when the conveyance was made and that there was no such evidence; (b) bank was required to

show actual fraud and failed to do so; (c) bank, as a subsequent creditor, was required to show the Martins assisted in a fraudulent purpose and failed to do so; (d) because the Martins paid valuable consideration and did not participate in the fraud, bank could not complain; and (e) because the corporation was solvent after the conveyance, it could not be set aside or declared fraudulent.

Section 428.020 states, as applicable to this appeal:

Every conveyance . . . of any estate or interest in lands, . . . made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands, . . . shall be henceforth deemed and taken, as against said creditors . . ., prior and subsequent, to be clearly and utterly void.

The debt that is the basis of bank's action to set aside the conveyance to the Martins arose from the 1995 check kiting activities of the Reeds and Harrisons. Bank reduced its claim against the Reeds and Harrisons to judgment in Counts I and II which are not part of this appeal. *See* n.4, *supra.*

As this court explained in *Dickinson v. Ronwin,* 935 S.W.2d 358 (Mo.App.1996):

"In order to set aside a conveyance as being in fraud of creditors, it must be shown that the conveyance was made with an intent to hinder, delay or defraud creditors." *Mark Twain Kansas City Bank v. Riccardi,* 865 S.W.2d 425, 427 (Mo.App. W.D.1993). The intent to defraud must be proven by clear and convincing evidence. *South Side Nat'l Bank in St. Louis v. Winfield Fin. Serv. Corp.,* 783 S.W.2d [140] at 143 [ (Mo.App.1989) ]. Because fraudulent intent is rarely proven by direct evidence, "Missouri courts are willing to look to 'badges of fraud,' which may be considered to determine the presence of fraud, since they are items which so frequently attend conveyances to hinder, de-

4. The lawsuit bank brought was in three counts. Count I sought damages from the corporation for losses bank incurred on the corporation's dishonored checks the Harrisons deposited. Count II sought damages from the Harrisons for the same losses. Count III was the action for fraudulent conveyance that is the subject of this appeal. Summary judgment was entered in favor of bank on Count I. Default judgment was rendered for bank on Count II. Those parts of the judgment have not been appealed.

lay or defraud creditors." *Citizens Nat'l Bank of Maryville v. Cook*, 857 S.W.2d 502, 505 (Mo.App. W.D.1993).

"The courts have recognized several 'badges of fraud' which include: (1) a conveyance to a spouse or near relative; (2) inadequacy of consideration; (3) transactions different from the usual method of transacting business; (4) transfers in anticipation of suit or execution; (5) retention of possession by the debtor; (6) the transfer of all or nearly all of the debtor's property; (7) insolvency caused by the transfer; and (8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious." *Nance v. Nance*, 880 S.W.2d 341, 346 (Mo. App. E.D.1994). Although none of the badges of fraud existing alone establishes fraud, a concurrence of several of them raises a presumption of fraud. *South Side Nat'l Bank in St. Louis v. Winfield Fin. Serv. Corp.*, 783 S.W.2d at 144.

*Id.* at 364.

■ Mr. and Mrs. Martin's first challenge to the trial court's finding that the conveyance to them was fraudulent is directed to the requirements of § 428.020. They assert that the statute prohibited bank from questioning the corporation's right to convey its real estate absent evidence that the corporation owed debts when the conveyance was made. They contend there was no evidence that it did.

■ The issue of whether the corporation owed debts following its transfer of real estate is but one of several factors to be examined in ascertaining if there was a fraudulent conveyance, i.e. whether, as stated in § 428.020, the conveyance was "made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands." As explained in *Dickinson*, fraudulent intent is rarely proven by direct evidence; hence, inferences raised by examining recognized "badges of fraud" are relied on to ascertain the presence of fraud. One of the badges is "insolvency caused by the transfer." *Dickinson*, 935 S.W.2d at 364.

■ Insolvency occurs when one is unable to pay debts as they become due in the ordinary course of business. *Racherbaumer v. Racherbaumer*, 844 S.W.2d 502, 505 (Mo. App.1992). And, pursuant to § 428.014.1, RSMo Supp.1992, "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." [5]

■ The trial court entered findings of fact and conclusions of law. The findings of fact state only, "Witness Leon Topp [sic], a neighbor of the Reeds, testified that in 1991 and 1992, the Reeds were 'going out of business'," and "[The corporation] made no answer to the allegation in [bank's] First Amended Petition that [the corporation] was insolvent since January 15, 1992." The conclusions of law include, "[The corporation] since January 15, 1992, until the time of trial (or during portions of that time) was insolvent."

The legal file that is part of the record on appeal includes bank's First Amended Petition and Mr. and Mrs. Martin's amended answer. Paragraph 2 of Count III in the amended petition alleges, "Defendant [corporation] since January 15, 1992, to the present (or during portions of that time) was insolvent within the meaning of § 428.014, V.A.M.S." Mr. and Mrs. Martin's amended answer denied the allegation on the basis that they were without knowledge or sufficient information to form a belief as to its truth. The legal file does not include an answer to the amended petition by the corporation.

The conveyance to the Martins occurred in 1992. The minutes of the corporation's annual board of directors meeting for 1992 was admitted in evidence. The meeting was held December 31, 1992. The minutes report the sale of 200 acres of land in Wright County; that the corporation had "no more land to sell." They reported the corporation's net worth as $89,375. The minutes of the corporation's annual board of directors meeting for the previous year, held December 31, 1991, reported net worth of $384,873. Minutes of annual board of directors meetings for the years 1993, 1994, 1995 and 1996 were admit-

**5.** § 428.014, RSMo Supp.1992, was enacted into law effective August 28, 1992.

ted in evidence. Each stated a positive net worth for the corporation as of the respective dates of the meetings.

Bank introduced the corporation's 1992 federal income tax return in evidence. The end of the year balance sheet that is Schedule L to the return revealed no liabilities and net worth of the corporation of $89,375, the same amount stated in the December 31, 1992, minutes of the corporation's board of directors.

Mr. Reed testified that at the time the corporation negotiated the sale of the 200 acres to Mr. and Mrs. Martin, it owed two debts. It owed approximately $25,000 to Mr. Martin from cattle transactions and the debt to bank that was secured by a deed of trust on the real estate that was being sold. According to the testimony of Mr. Reed and Mr. Martin, any debt owed to Martin was extinguished as part of the sale agreement. The debt to bank was paid from the sale proceeds. Mr. Reed testified that after these debts were eliminated, the corporation owed no one "except just light bills or telephone bills." The corporation remained in business after the sale.

There was no evidence that the corporation was insolvent immediately after it conveyed the 200 acres to Mr. and Mrs. Martin. Bank produced no evidence that the corporation was unable to pay its debts as they became due following the sale of the 200 acres to Mr. and Mrs. Martin, or that the sum of the corporation's debts was greater than the value of its assets after the sale.

Until late November 1995, when the check kiting that resulted in the bringing of Counts I and II of the lawsuit occurred, there was no showing that the corporation was insolvent. To the extent the trial court found otherwise, its conclusion that the corporation was insol-vent is in error in that it is not supported by the evidence and is against the weight of the evidence.

■ The Martins' next assertion in support of Point I is that bank was required to show actual fraud to be entitled to recover. This is incorrect. As *Dickinson* held, the presence of fraud is determined by looking at the badges of fraud. *See also Citizens Nat. Bank of Maryville v. Cook*, 857 S.W.2d 502, 505 (Mo.App.1993). To ascertain if a conveyance is fraudulent, it is necessary to look at more than one badge of fraud. For a conveyance to have been fraudulent, several indicia of fraud must be shown. *Id.* Intent to defraud must be shown by clear and convincing evidence. *Id.*

■ The next claim under Point I is that because bank was a subsequent creditor, it was required to show Martins assisted in a fraudulent purpose; that there was no such showing. The applicable statute, § 428.020, establishes the time when a fraudulent intent must be found in order to set aside a conveyance as fraudulent. It provides, "Every conveyance ... *made or contrived with the intent to hinder, delay or defraud creditors* ... shall be henceforth deemed and taken, *as against said creditors* ..., *prior and subsequent*, to be clearly and utterly void." (Emphasis added.)

A conveyance of real estate is "made" by the grantor in the conveying instrument, the owner of the real estate conveyed. Although a grantee could have been involved in "contriving" the conveyance, the grantee is not the one whose intent must be determined in ascertaining if a conveyance was made for purposes of defrauding creditors. Bank was not required to show that the Martins assisted in a fraudulent purpose.[6]

---

6. It is appropriate to note that bank's claim arose when the November 1995 check kiting occurred. The conveyance was made in March 1992, more than three and one-half years before the bank's claim existed. There was no evidence at trial indicating the check kiting scheme was planned three years before it occurred. There was no evidence that the conveyance to the Martins was for the purpose of hindering repayment of a creditor whose claim would be based on an illegal check scheme that might occur some years in the future.

Section 428.020 states, "Every conveyance ... made ... with the intent to hinder, delay or defraud creditors ... shall be henceforth deemed and taken, *as against said creditors* ..., prior and subsequent, to be clearly and utterly void." (Emphasis added.) Arguably, this would require a grantor to intend, at the time of the conveyance, to defraud a particular existing creditor or a foreseeable subsequent creditor before the conveyance would be "clearly and utterly void" as to that creditor. However, that argument is not

Mr. and Mrs. Martin's next claim with respect to Point I is that the evidence at trial did not support the trial court's finding that they did not give adequate consideration. The trial court found that the consideration the Martins gave was $100,000. It concluded the fair market value of the real estate in 1992 was $135,000. It found that the consideration was inadequate.

There was varying evidence of the fair market value of the real estate (one real estate appraiser stated the value of the property was $126,400), as well as evidence that the sale price was $125,000. Both issues were contested. The trial court, however, as the fact finder, was entitled to accept or reject all, part or none of any witness' testimony. *Wates v. Joerger,* 907 S.W.2d 294, 297 (Mo.App.1995). This court, for purposes of its review, accepts the trial court's determinations of fact, *viz.,* that the sale price was $100,000 and its fair market value was $135,-000. Thus, the corporation sold the real estate to Mr. and Mrs. Martin for approximately 74% of its fair market value.

*Compare Miner v. Bennett,* 556 S.W.2d 692, 695 (Mo.App.1977), which found a fraudulent conveyance occurred when property was sold for one-fourth its value. *See also Oldham v. Wright,* 337 Mo. 170, 85 S.W.2d 483, 485 (1935), that held a conveyance was fraudulent where the consideration was assumption of an encumbrance of one-fourth to one-fifth the value of the property; and *Swallows v. Holden,* 812 S.W.2d 552, 555 (Mo.App.1991), that set aside a conveyance as fraudulent when the consideration was the grantee's agreement to pay a mortgage for which he was already personally liable.

In addition to the corporation receiving $100,000 for the sale of the property, its sole shareholders, Mr. and Mrs. Reed, were given the opportunity to reacquire the property upon payment of $125,000 (plus interest running from the date of the conveyance) to the Martins. This opportunity was to continue for twenty years. Additionally, the $100,000 cash the Martins paid permitted the corporation to pay the debts it owed at the time of the conveyance. The circumstances in this case are unlike those in *Miner, Oldham* or

*Swallows.* This court concludes that payment by the Martins of an amount equal to 74% of the highest appraised value in evidence was adequate consideration. The trial court's conclusion to the contrary was an erroneous application of law.

The Martins' final argument under Point I is that because the corporation was solvent after the sale, the sale could not, as a matter of law, be set aside or declared fraudulent. As explained in *Dickinson v. Ronwin,* 935 S.W.2d at 362–63, Missouri cases contain divergent views on how a grantor's solvency following conveyance of real estate affects a claim that the conveyance was made in fraud of creditors. As in *Dickinson,* the issue of whether solvency following such a transfer is determinative need not be decided in that, for the reasons that follow, this court concludes that, applying the badges of fraud rationale, the conveyance was not fraudulent.

(1) The conveyance by the corporation to the Martins was not a conveyance to a spouse or to a close relative. (2) The consideration was not inadequate. (3) The transaction, as found by the trial court, was different from the usual method of transacting real estate business; however, as discussed subsequently, under the circumstances of this case, this court gives little weight to this factor. (4) The transfer was not in anticipation of suit or execution. (5) The grantor did retain possession of the real estate. (6) This was a transfer of the bulk of the corporation's remaining property; however, in view of the significant purchase price paid by the purchasers and the use of most of the amount received to pay the encumbrance to which the real estate was subject, this court does not consider this a factor detrimental to the corporation. (7) The corporation was not insolvent at the time of the transfer nor immediately after the transfer. Determinations (3), (4) and (5) warrant further comment.

*Number (3):* The trial court found, and this court agrees, that the purchase of real estate without receiving proof of title, such as an abstract or commitment for title insurance, and the giving of a third-party check as part of the purchase price was not the usual

made in this appeal. This court, therefore, does not decide that issue.

way real estate transactions are conducted. However, the unusualness of the transaction did not go unexplained.

The buyers had known this tract of land as the homeplace of the Reeds for many years. Mr. Reed's parents owned the land and lived there before his father died and before Mr. and Mrs. Reed purchased it from Mr. Reed's mother.

Mr. Martin knew the land had been mortgaged to the bank. He paid for the land and awaited receipt of his warranty deed until after the obligation to the bank that was secured by an encumbrance on the real estate was satisfied. The Martins made a cash purchase. They had no lending agency to satisfy as to the condition of title. Mr. Martin testified that he had done business with the Reeds and Mr. Reed's father for many years and that he trusted them, albeit that his trust of Mr. and Mrs. Reed later waned. Under those circumstances, this court attaches little significance to the fact the sale closed in an unusual manner.

Likewise, this court finds nothing significant about the fact that part of the purchase price was paid by a third-party check. Mr. Martin was a cattle trader. He was obviously accustomed to transacting business by exchanging and negotiating personal checks with other cattle traders. He had such a check in his possession. He endorsed it and delivered it as partial payment for the real estate. The check was promptly negotiated and honored by the bank on which it was drawn.

The testimony at trial satisfactorily explained the circumstances of the transaction between Mr. and Mrs. Martin and the corporation. The facts in evidence are consistent with an honest conveyance. "Fraud is never presumed when the transaction may be fairly reconciled with honesty." *Campbell v. Rickert,* 938 S.W.2d 282, 286 (Mo.App.1997).

*Number (4):* The transfer was not in anticipation of suit or execution. The transfer was by the corporation. The evidence disclosed no judgment or pending suit against the corporation at that time or until this suit was brought in 1996 almost four years after the conveyance in question.

The trial court concluded that the transfer was made when creditor CPCA was applying pressure to collect a judgment it had against the Reeds. This was not a judgment against the corporation, nor was there any showing that CPCA attempted to impose it against the corporation. The trial court's determination is not material to this case.

*Number (5):* The corporation and Mr. and Mrs. Reed retained possession of the real estate. The corporation continued to operate its business there. Mr. and Mrs. Reed continued to live in the house on the property. The Reeds were permitted to do this upon agreeing to pay the equivalent of 8% of what the Martins considered they had paid for the property, paying the taxes on the property and keeping the property insured.

In addition to the "badges of fraud" heretofore discussed, there is an eighth badge, "failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious." *Dickinson,* 935 S.W.2d at 364. The trial court concluded that "[the corporation] failed to produce evidence to rebutt [sic] the unusual and suspicious circumstances surrounding the transaction." It did not acknowledge the strenuous defense asserted by Mr. and Mrs. Martin. This court finds passive involvement of the corporation at trial insignificant.

Point I is well-taken. The trial court erred in granting bank judgment on Count III, its action to set aside the conveyance from the corporation to the Martins. The finding of a fraudulent conveyance was not supported by substantial evidence; it was against the weight of the evidence. The setting aside of the conveyance was an erroneous application and declaration of the law. The Martins' remaining points on appeal are, therefore, moot. They require no discussion.

The judgment is reversed as to Count III and remanded. The trial court is directed to enter judgment for Dale Martin and Glendora Martin as to Count III. The judgment as to Counts I and II is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.