Wilda J. TAYLOR, Plaintiff–Appellant,

v.

Robert L. CLARK, Janette K. Clark, and Clark Drilling, Inc., Defendants–Respondents.

No. 25471.

Missouri Court of Appeals, Southern District.

June 30, 2004.

Petition for Rehearing and Transfer Denied July 21, 2004.

Application for Transfer Denied Aug. 24, 2004.

---

Steven E. Marsh, Hulston, Jones & Marsh, Springfield, MO, for appellant.

James R. Fossard, Pratt, Fossard & Jensen, L.L.C., Springfield, MO, for respondent.

JAMES K. PREWITT, Judge.

Wilda J. Taylor ("Wilda") brought an action against Robert L. Clark ("Robert"), Janette K. Clark ("Janette"), and Clark Drilling, Inc. ("Clark Drilling") under Missouri's Fraudulent Transfers Act (§§ 428.005—428.059, RSMo 2000) and common law in which she alleged that transfers occurred among the defendants through which Robert and Janette attempted to evade a debt Robert owed Wilda for maintenance pursuant to a dissolution decree. Wilda appeals from the February 26, 2003 amended judgment in which the trial court ruled in her favor on one of three counts from her petition, finding that certain stock transfers were fraudulent, in violation of § 428.024, RSMo 2000, and awarding her damages in the amount of $23,773. Wilda raises eight points on appeal, which will be discussed following a more complete recitation of the pertinent facts.[1]

---

1. For simplicity sake, we will refer to the parties in this case by their first names. We mean no disrespect.

## Facts

During the 1970s, Robert took over his father's water well drilling business, which Robert operated out of Springfield, Missouri. Sometime in the late 1970s or early 1980s, the company expanded and began drilling oil wells in Oklahoma under the corporation name of R.L. Clark Drilling Contractors, Inc. Robert was married to Wilda at this time.

The oil drilling venture, at least initially, was quite successful, with Robert's annual income in the range of $75,000 to $100,000. It was still successful when Robert and Wilda's marriage was dissolved in Greene County, Missouri on April 7, 1983. Pursuant to the dissolution decree, Robert was ordered to pay Wilda maintenance in the amount of $2,200 per month.

Robert married Janette on December 14, 1984. During the period between Robert and Wilda's divorce and Robert's subsequent remarriage, business for R.L. Clark Drilling Contractors, Inc. declined dramatically, with the company eventually reaching insolvency, requiring the corporation to file for bankruptcy protection. The bankruptcy petition was originally filed under Chapter 11, but later switched to Chapter 7 because too much money was owed to try to reorganize. R.L. Clark Drilling Contractors, Inc.'s bankruptcy became final in 1985. Robert did not personally file bankruptcy.

Sometime in 1986, Wilda filed a motion for contempt against Robert, alleging his failure to pay child support and maintenance. There is no disagreement among the parties that the order entered following a hearing on the motion for contempt included a provision increasing child support to $1,000 per month, which Robert paid until one of Robert and Wilda's sons, Paul, moved in and began living with Robert and Janette. Regarding the payment of maintenance, according to Wilda, Robert stopped paying the required amount in 1986, prior to her filing of the motion for contempt. According to Robert, he complied with the payment of "voluntary" maintenance after the divorce, but admitted that he paid no maintenance after the order was entered on Wilda's motion for contempt because, in his determination, continued maintenance was not mandated, since the order apparently only referenced the increased child support.

Clark Drilling, a Missouri corporation, was incorporated on June 12, 1992. The new corporation was formed in an effort to "stay in business" and "bring [Robert's] water well business back[.]" After consultation with his longtime accountant, Bill Compere ("Compere"), Robert decided to form Clark Drilling as a Subchapter S Corporation, with Robert as the sole shareholder. According to Robert, there was concern over potential workers' compensation liability, and by forming the S corporation with Robert as sole owner, officer, and shareholder, but placing all assets (both personal and corporate) in Janette's name, if something occurred that created liability, it would go against the corporation first and then Robert, who would have nothing. Janette noted that after the bankruptcy in 1985, it was difficult for Robert to obtain credit, and they started placing assets in her name at that time.[2]

2. We note here that Subchapter S is a tax status that is allowed under the Internal Revenue Code, where the tax treatment is essentially that afforded a partnership. *Thill v. Thill*, 26 S.W.3d 199, 202 (Mo.App.2000). Under Missouri law, a small business corporation may elect to be taxed as an S Corporation, which is governed by § 143.471, RSMo 2000. *Lipic v. Lipic*, 103 S.W.3d 144, 151 (Mo.App.2003). In this opinion, we use the terms "Subchapter S Corporation" or "S Cor-

Compere described an S corporation as one in which the "shareholders pay on all the income that the corporation has, above what their salaries were [and] operating expenses." He further compared it to a sole proprietorship or partnership in that an S corporation provides "some legal protection .... [b]ut ... the income of the company, after all expenses, is reported on the tax return of the shareholders." Therefore, according to Compere, it was unnecessary to retain earnings, since any amount the corporation earned above expenses would be drawn out, and reported, as income by the shareholders.

Janette, as an employee of Clark Drilling when it was formed, received a monthly salary of $1,100. Robert's monthly salary was $2,000. Janette managed the corporation's checkbook. Per Compere's recommendation, Janette initially attempted to maintain separate accounts for Clark Drilling expenses and her and Robert's personal expenses, but "[i]t did not work[.]" Thus, Janette, Robert, and Clark Drilling had one checking account, and all expenses and bills, both personal and company-related, were paid from that account. Janette's understanding was that, because Clark Drilling was an S corporation, she could use that checking account to "write a check for anything [she] want[ed] to write a check for[,]" but that "whatever [she wrote] personally out of the checking account ... [she would] pay taxes on[.]" Compere, as the accountant, had responsibility for coding the checks to ensure that expenses were reported correctly.

In October 1996, garnishment proceedings were held which resulted in the garnishment of Robert's income from and interest in Clark Drilling. Effective October 17, 1996, Robert retired from Clark Drilling, and his last paycheck was dated that day. Also beginning in November 1996, Janette's salary increased to $3,000, as she began receiving the salary Robert had previously received. According to both Robert and Janette, Robert retired due to health reasons, and a doctor recommended that he do so. Robert also had concerns about dying. Robert indicated that avoiding paying Wilda was not "the total reason" he retired, "but that [it] was a damn good initiative."

On November 12, 1996, and January 3, 1997, Janette filed answers to the garnishments, and denied that Clark Drilling had any property or assets of Robert's. In February 1997, Robert transferred forty-five of his fifty shares in Clark Drilling to Janette. Janette neither paid for the stock nor transferred anything of value in return. In February 1999, Robert transferred the remaining five shares to Janette. Similar to the previous transaction, there was no payment or transfer of value in exchange for the stock. According to Robert, he considered the book value of each share to be $10 per share, both in 1997 and 1999.

Janette stated that the reasons for transferring the shares to her were the same in 1997 and 1999. Specifically, she and Robert were concerned about liability, particularly workers' compensation liability, and Robert was concerned about dying and making estate planning decisions, and so transferred the shares to Janette to alleviate any confusion or argument regarding the shares between Janette and the children, one of whom was Janette's and four of whom were Robert's.

On December 9, 1999, Wilda filed suit against Robert, Janette, and Clark Drilling. Wilda's first amended petition was filed on October 23, 2001. Wilda asserted

poration" only for convenience and because the testimony refers to Clark Drilling as such.

that Robert owed her at least $239,600 in unpaid maintenance. Under Count I, Wilda alleged that "[a]ll transfers of money, funds, property, income and assets between Robert, Janette and Clark Drilling should be avoided and set aside as fraudulent[.]" In addition, all income, assets, stock, and property held and owned by Janette and Clark Drilling should be subjected to the payment of Robert's debt. Further, essentially any money withdrawn from Clark Drilling and any property acquired through Clark Drilling, whether by Robert or Janette, should be subjected to the payment of the unpaid maintenance debt.

There were two additional counts in the petition. Under Count II, Wilda alleged that Robert and Janette's conduct was intentional and/or reckless, and committed with the intent to harm, damage, hinder, defraud, delay, and/or interfere with Wilda's efforts and rights as a creditor. Under Count III, Wilda alleged that Robert and Janette's conduct "was committed and carried out pursuant to the agreement, conspiracy, understanding and concerted action of the Defendants."

A trial was held on the matter on August 28–29, 2002. On the first day of trial, counsel for Wilda filed a request for findings of fact. In addition to testimony from Wilda, Robert, and Janette, two experts testified regarding the value of the business and the transferred stock. Brian Weimer ("Weimer") testified on Wilda's behalf, and Compere testified as part of the evidence presented by Robert, Janette, and Clark Drilling.

Weimer, a certified public accountant who had performed fifteen business valuations in the past, reviewed the summary of the checks, general ledger coded by Compere's firm, and some of the individual and corporate tax returns. Weimer first calculated the earnings of the corporation, which he estimated to be $80,000 from ordinary income, rent received on assets that Janette owned, and W–2 income. Even though none of the earnings were retained, Weimer calculated a rough value of Clark Drilling to be between $240,000 and $560,000. The numbers were derived by using a multiplier ranging from three (for the most conservative value of $240,000) to seven (to achieve the $560,000). Since the book value of Clark Drilling was minimal ($735 in 1997), Weimer did not use that number in his valuation.

Weimer also noted that Clark Drilling had paid dividends to its shareholders of $35,312 in 1997 and $19,118 in 1998, with the book value in 1998 of $1,990. Weimer believed the corporation to be profitable. He agreed with the accounting practice that any personal expenses paid out of the corporation should be recorded as income to the shareholders. However, he indicated that he calculated $21,113.92 worth of expenses in 1996 that were coded as operating expenses that he determined were personal expenses.

Compere, also a certified public accountant who worked as a partner in a certified public accounting firm until July 1, 2000, testified that there were various methods by which to calculate the fair market value of a business. One way was to consider the underlying value of the net assets and another method involved the capitalization of "the excess adjusted debt income" or "how much ... the business [made] after reasonable compensation ... to the shareholders."

As for the underlying value of the net assets, Compere noted that in December 1996, Clark Drilling owned very few assets, and those fixed assets had a book value of $735. Therefore, according to Compere, Clark Drilling's fair market value under that method was not "worth any-

thing at all." According to Compere, the business was a service business and the Clarks (Robert and Janette) were vital to the business, and the business relied on them to generate its income. As for the forty-five shares of stock transferred in 1997, Compere indicated that their value, particularly without Robert and Janette, was zero. He had the same valuation of the five shares transferred in 1999.

As for the salaries, in Compere's opinion, what Robert and Janette made in salary income was understated, in that they contributed much more to the business than what they were compensated. Compere testified that there were no excess earnings because Robert and Janette were not fairly compensated for their expertise. The fact that Clark Drilling was an S corporation contributed to this as the salaries in such a corporation are typically kept low so not to have a negative loss amount, but the corporation also did not have the capacity to generate higher salaries for officers and employees.

For 1996, Robert's W–2 salary was $20,000, and Janette's $13,750, and "the net end of the business" was $25,907. By 1998, those salaries had decreased. Robert was no longer receiving a salary and Janette's salary was only $4,000. Even with those low salaries, the corporation only "made" $19,488. In Compere's estimation, business was not good for Clark Drilling. Compere's valuation as of December 1998 was that the corporation had a fair market value of zero, because it was not making satisfactory income to even compensate its officers. In the years leading to trial, the business continued to decline. From 1996 through 2000, Janette worked one or two days a week, but in 2000 began working more as there was an overall decrease in number of employees.

Exhibits admitted at trial showed a shareholder's equity at the end of 1996 of negative $2,415, which Compere interpreted as zero. At the end of 1998, the shareholder's equity was $1,990.

Compere's overall method of valuation first considered the value of the underlying assets, which he determined to be essentially nothing, and then capitalizing the excess earnings above what would be reasonable compensation for the officers. Considering the 1997–1999 time period, Compere testified that he did not believe Robert and Janette were reasonably compensated.

Although it was coded as such in the general ledger, Compere disagreed with using the term dividends. He noted that the income received after salaries was technically a dividend, but the proper terminology was a distribution of earnings that, in an S corporation, must be reflected as income for the shareholders. Compere also disagreed with Weimer's valuation method. Compere stated that Weimer needed to capitalize the income and take into account that officers should be compensated fairly, and that taking salary and adding that to income of the corporation to estimate the earnings of the corporation was not an appropriate method to valuate a business.

Compere noted that Robert and Janette, although they did not keep separate accounts, did have their personal expenses charged against their "dividend" account and individual tax returns showed that they had reported any amounts used for personal expenses as income. Compere disputed Weimer's contention that items that were actually personal expenses had not been charged against the dividend account. According to Compere, they "did not file a tax return that would have personal expenses charged as an [operating] expense." It was Compere's responsibility to recode items, if necessary, from the general ledger.

Regarding Robert's involvement with the business, Compere testified that he was aware that Robert was trying to phase out of the business in late 1996. Compere also testified that, during the period two years prior to trial, Robert had no significant involvement in the business. Robert testified that he still came into the office each day, but primarily out of habit to read the paper and drink coffee.

Compere stated that he had advised Robert and Janette regarding the stock transfers, particularly in 1997, and since it was a transfer between spouses for such a nominal (if any) value, Compere did not consider it necessary to report any compensation for the stock to the Internal Revenue Service. As for the propriety of the 1997 transfer of shares, Compere testified it was something he discussed with Robert and Janette and all mutually agreed to it. Regarding the debt to Wilda, Compere had originally been part of the discussions on determining maintenance during the dissolution proceedings and was of the understanding that Robert no longer owed the debt or any maintenance following the order on Wilda's motion for contempt in 1986.

In terms of the original decision to have Robert be the sole shareholder in an S corporation and placing all assets in Janette's name, Compere could not remember any particular advice in that regard. He acknowledged that although, in his opinion, the stock transfer in 1997 was accomplished to ensure that Janette had ownership in the corporation, such a decision defeated any previous notion of the legal protections associated with Robert as the sole shareholder and all assets in Janette's name.

Following trial, on December 31, 2002, the trial court sent a letter to attorneys for all parties, which contained the court's findings and findings of fact. An amended judgment was filed on January 15, 2003, with a motion to amend, modify, vacate, re-open or correct judgment and alternative motion for new trial filed by Wilda's counsel on January 23, 2003. A second amended judgment, which disposed of all three counts in the petition, was filed on February 26, 2003. The trial court adopted the December 2002 letter to counsel as part of its findings in the second amended judgment.

Within the second amended judgment, the trial court found that the transfer of shares in 1997 and 1999 "were fraudulent transfers with the intent to hinder, delay and defraud [Wilda]." The trial court found that the value of Clark Drilling in 1996 and early 1997 was zero, but that in early 1999, the corporation had a value of $1990. As for the stock, the court found that the forty-five shares transferred in 1997 had a value of zero, but that the five shares transferred in 1999 had a value of $995. The court also found that Clark Drilling, regardless of who held the stock, was under the shared ownership of Robert and Janette, which the court utilized in its determination of the value of the stock transfer in 1999. Further, the court found that the transfer of Robert's net salary from November 1996 through December 1997, which totaled $22,778, constituted fraudulent transfers with the intent to hinder, delay, and defraud Wilda in violation of § 428.024, RSMo 2000. The court found that it would serve no purpose to set aside either the stock transfers or the salary transfers. Overall, the trial court ruled in favor of Wilda on Count I in her amended petition, awarding damages in the amount of $23,773. Judgment was entered in favor of Robert, Janette, and Clark Drilling on Counts II and III.

This appeal followed.

### Discussion

Wilda raises eight points on appeal. For all, our general standard of review is that the trial court's judgment will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously applies or declares the law. *Dickinson v. Ronwin*, 935 S.W.2d 358, 362 (Mo. App.1996). Credibility of the witnesses and the weight given their testimony is a matter for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Stafford v. McCarthy*, 825 S.W.2d 650, 651 (Mo.App.1992). Further, we defer to the factual findings of the trial court, because it is in a superior position to assess credibility. *Behr v. Bird Way, Inc.*, 923 S.W.2d 470, 472 (Mo.App.1996).

 To set aside a transfer as fraudulent, it is necessary to show that the transfer was made with an intent to hinder, delay, or defraud creditors. *Dickinson*, 935 S.W.2d at 364. "The key elements of a fraudulent conveyance are the conveyance of goods or titles with an intent to hinder, delay, or defraud creditors." *Bueneman v. Zykan*, 52 S.W.3d 49, 54 (Mo.App.2001). Intent to defraud must be shown by clear and convincing evidence. *First Home Sav. Bank v. C & L Farms, Inc.*, 974 S.W.2d 621, 627 (Mo.App.1998). Fraudulent intent is rarely proven by direct evidence; thus, it is acceptable in Missouri courts to determine the presence of fraud by considering particular badges of fraud. *Dickinson*, 935 S.W.2d at 364.

 The badges of fraud include:

1) a conveyance to a spouse or near relative;

2) inadequacy of consideration;

3) transactions different from the usual method of transacting business;

4) transfers in anticipation of suit or execution;

5) retention of possession by the debtor;

6) the transfer of all or nearly all of the debtor's property;

7) insolvency caused by the transfer; and

8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious. *Id.*

For a transfer to be found fraudulent, several indicia of fraud must be shown. *First Home Sav. Bank*, 974 S.W.2d at 627. More than one badge of fraud must be considered. *Id.*[3]

Under § 428.024, RSMo 2000, a transfer "is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1)[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor...." § 428.024.1, RSMo2000; *see also State ex rel. Mo. Highway & Transp. Comm'n v. Overall*, 53 S.W.3d 222, 226 (Mo.App.2001).

Section 428.024.2, RSMo 2000, also enumerates the badges of fraud, and contains eleven factors that may be given consideration in determining actual intent under

---

**3.** The Uniform Fraudulent Transfer Act was enacted effective August 28, 1992 and consists of §§ 428.005 to 428.059. *Behr*, 923 S.W.2d at 477 n. 3. Also on that date, several sections of Chapter 428, which was titled "Fraudulent Conveyances" were repealed and replaced with the above sections, which were broadened to discuss fraudulent transfers and the chapter re-titled "Fraudulent Conveyances and Liens." *See id.* Although the term conveyance refers to transfers related to real estate (Black's Law Dictionary 333 (6th ed.1990)), the Uniform Fraudulent Transfers Act operates the same for conveyances as it does for the fraudulent transfers alleged here. Certain cases cited in this opinion, however, only use the conveyance terminology, but are applicable to analyze fraudulent transfers.

§ 428.024.1, RSMo 2000. In particular, § 428.024.2, RSMo 2000, provides:

In determining actual intent under subdivision (1) of subsection 1 of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Point I—Flow and transfers of cash from Robert to Janette through Clark Drilling*

In her first point, Wilda argues that the trial court erred in failing to award her damages with respect to the flow and transfers of cash from Robert to Janette through Clark Drilling that were used to pay Janette's personal bills and expenses, to pay for her sole and separate property, and/or for her personal benefit. Wilda provides three primary reasons for her assertion in this point.

The first is that Robert was insolvent under § 428.014, RSMo 2000, before and after the transfers, and there was inadequate consideration given by Janette for these cash transfers. Further, under this reason, Wilda notes that it was unnecessary to prove actual intent to hinder, delay, or defraud, as it was not a required element to show transfers are fraudulent as to a present creditor, under § 428.029, RSMo 2000.

Second, Wilda contends that, contrary to the holding and findings of the trial court, proof of fraud was not essential under § 428.024.1(1), RSMo 2000, with respect to the cash transfers. Further, the cash transfers were fraudulent even if they merely hindered or delayed Wilda as a creditor.

Third, because the trial court found and held that the transfers of stock were fraudulent in violation of § 428.024.1(1), RSMo 2000, the trial should have also held that the transfers of Clark Drilling assets, including the cash transfers and dividends, were fraudulent.

Since Wilda refers to particular sections, we will detail them here. Section 428.014, RSMo 2000, provides:

1. A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

2. A debtor who is generally not paying his debts as they become due is presumed to be insolvent.

3. A partnership is insolvent under subsection 1 of this section if the sum of the partnership's debts is greater than the aggregate, at a fair valuation, of all of the partnership's assets and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts.

4. Assets under this section do not include property that has been trans-

ferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under sections 428.005 to 428.059.

5. Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Section 428.029, RSMo 2000, provides:

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

2. A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

The trial court found that the stock transfers in 1997 and 1999 were fraudulent, as well as Robert's transfer of his salary to Janette from November 1996 through December 1997. The court also found that Janette had neither transferred anything of value nor paid anything for the shares. In addition, one of the court's findings was that Janette's duties within Clark Drilling had not substantially changed "[i]n and since" October 1996; however, her time spent working at Clark Drilling did increase in 2000.

Among the court's other findings was that Robert did not have a checking or bank account in his name since 1992 when Clark Drilling was incorporated. Further, also since 1992, both Robert and Janette used the Clark Drilling checking account as their personal checking account. The court agreed with Compere that using a single checking account for both personal and operating expenses was not unusual, nor was the accounting practice of treating the payments as dividends.

As for the status of Clark Drilling as an S corporation, the court determined that even though all 50 shares were held by Robert, the business was actually owned by both Robert and Janette as a closely-held corporation or family business. This determination led to the court's findings regarding the valuations of Clark Drilling and the stock transfers.

According to the court, the bankruptcy of R.L. Clark Drilling Contractors, Inc. in the 1980s caused Robert credit problems, and he and Janette acquired assets after that time, but sometimes titled them only in Janette's name for testamentary and estate planning purposes, even though they essentially owned them as joint assets (vehicles, homes, land, drilling rigs, etc.).

▮ Under the Internal Revenue Code, when considering or counting the number of shareholders of an S corporation, husband and wife are treated as one shareholder, regardless of whether each owns stock in the corporation. 26 U.S.C.S. § 1361(c)(1) (2004). The characteristics of a closely-held corporation in Missouri include: 1.) a small number of shareholders; 2.) the lack of a ready market for the stock; and 3.) substantial participation in business operations by the stockholders. *Thill v. Thill,* 26 S.W.3d 199, 203 n. 3 (Mo.App.2000). It has also been noted in Missouri that shareholders in a closely

held corporation "may have a superior opportunity for manipulation of corporate activities and control of corporate and individual assets." *State ex rel. Wilson v. Davis,* 979 S.W.2d 253, 256 (Mo.App.1998).

Based on the evidence and applicable standard of review, we do not agree with Wilda that the trial court erred in failing to award her damages or other relief based on the flow or transfer of cash through Clark Drilling to Janette. Such practices began after the bankruptcy of R.L. Clark Drilling Contractors, Inc. and represented the usual accounting practices of Robert, Janette, and Clark Drilling since that corporation began in 1992. We would agree that perhaps the accounting was not as accurate as it should have been, in that there may not have always been the appropriate separateness between personal and operating expenses, but tax returns showed that efforts were made to maintain such separateness. However, whatever lax accounting practices may have been present were consistent, and we agree with the trial court that the evidence shows that the transfers of which Wilda complains here were not fraudulent transfers.

In the respondent's brief, counsel for Robert, Janette, and Clark Drilling argues that there it is an "error in logic" for Wilda to contend the trial court should have set aside transfers from Clark Drilling to Janette as fraudulent. According to the respondents, Clark Drilling is not a creditor of Wilda, as any maintenance debt is not that of the corporation. Therefore, the analysis above, respondents argue, is unnecessary. Although we agree that the maintenance debt is Robert's and not the corporation's, we find it is pertinent to address Wilda's arguments as presented given that, where the trial court found in favor of Wilda, it did so against Robert, Janette, and Clark Drilling, "jointly and

severally[.]" In addition, as is addressed below in the analysis of Point II, Wilda may also have a claim related to Clark Drilling if it is appropriate to pierce the corporate veil of Clark Drilling and find that Robert is its alter ego.

Point I is denied.

*Point II—Flow and transfers of cash fraudulent because Clark Drilling was Robert's alter ego*

The subject of this point is the same as Point I, in that it is the flow and transfer of cash to Janette through Clark Drilling that is of concern. Wilda's reasoning for the trial court's error here is that Clark Drilling was the alter ego of Robert and as such the corporation was used to hinder, delay, or defraud Wilda as a creditor, and the cash transfers met the badges of fraud.

The circumstances under which Missouri courts will pierce the corporate veil and hold the corporation's owner liable for the corporation's debt are narrow. *Patrick V. Koepke Constr., Inc. v. Paletta,* 118 S.W.3d 611, 614 (Mo.App.2003). A court may pierce the corporate veil or disregard the separate corporate entity if the separateness is used as a device to defraud a creditor. *Sansone v. Moseley,* 912 S.W.2d 666, 669 (Mo.App.1995). The existence of a corporate entity will be disregarded when the corporation is operated while undercapitalized or if its assets are stripped to avoid the demands of creditors. *Id.*

To pierce the corporate veil, a plaintiff must show:

1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no sepa-

rate mind, will or existence of its own; and

2) Such control must have been used by the corporation to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest or unjust act in contravention of plaintiff's legal rights; and

3) The control and breach of duty must proximately cause the injury or unjust loss complained of.

*Patrick V. Koepke Constr., Inc. v. Paletta,* 118 S.W.3d at 614–15.

▮▮▮ Given the trial court's determinations regarding the tax status of Clark Drilling as an S corporation and its operation essentially as a closely-held corporation, we cannot agree with Wilda that the situation here met the necessary criteria above for piercing the corporate veil, as many of the accounting practices, tax treatment, etc., at issue here are acceptable under the characteristics of an S corporation or a closely-held corporation. Taking this with the above analysis of Point I, Wilda's second point is also denied.

*Point III—Trial court erred in finding Janette was co-owner of Clark Drilling*

In her third point, Wilda argues that the trial court's finding and holding that Janette was an owner or co-owner of the shares of Clark Drilling misapplied or erroneously declared the law and was against the weight of the evidence. Wilda contends that the court's finding that Robert was the sole owner of all fifty shares in Clark Drilling and that Janette provided no consideration for the transfer of the shares contradicts a holding that Janette is owner or co-owner of Clark Drilling.

▮▮▮ The trial court found that all fifty shares of Clark Drilling were held by Rob-

ert, but that the business was actually operated as a closely-held family corporation on a 50–50 basis between Robert and Janette based on their marriage and contributions to the business. This provided the trial court with the foundation to value the stock transfers at fifty percent of the corporation's valuation in the specified years, which was zero in 1997 and $1,990 in 1999, leading to a valuation of the 1999 stock transfer of $995.

As discussed in the previous points, given our standard of review, the trial court's findings were not against the weight of the evidence, and fall in line with the characteristics found of S corporations and closely held corporations. Point III is denied.

*Point IV—Failure to set aside stock transfers*

In Point IV, Wilda contends that the trial court erred or abused its discretion is failing to set aside the stock transfers to Janette. Wilda argues that fraudulent transfers are void or voidable and that trial court's refusal to set aside the transfers allowed Robert, Janette, and Clark Drilling to benefit from the fraud by permitting the flow and transfers of cash to Janette to continue.

Pursuant to § 428.044, RSMo 2000, "to the extent a transfer is voidable in an action by a creditor under subdivision (1) of subsection 1 of section 428.039, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection 3 of this section or the amount necessary to satisfy the creditor's claim, whichever is less." § 428.044.2, RSMo 2000. Further, under § 428.044.3, RSMo 2000, "[i]f the judgment under subsection 2 of this section is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." Section 428.039 provides that "[i]n an ac-

tion for relief against a transfer or obligation under sections 428.005 to 428.059, a creditor, subject to the limitations in section 428.044 may obtain: (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim[.]" § 428.039.1(1), RSMo 2000.

 Wilda is correct that fraudulent transfers may be void as against creditors. *Coleberd v. Coleberd,* 933 S.W.2d 863, 870 (Mo.App.1996). However, we disagree with Wilda's contention that voiding the fraudulent stock transfers here implies that such transfers must be undone. We note that fraudulent conveyances are generally valid as against a grantor. *Id.* In such cases, a party who makes a conveyance for the purpose of hindering, delaying, or defrauding a creditor, will ordinarily be left where the court finds him. *Id.* Although the fraudulent transfers here did not involve a fraudulent conveyance of real estate, the trial court did not err in refusing to set aside the transfers because the court followed the law and voided the transfers as it related to her, as a creditor.

We agree with the trial court that under the circumstances of this case, where Robert transferred, according to the court, half of his interest in shares of Clark Drilling to Janette, what he transferred will not be returned to him. Wilda was awarded the value of the stock transfers as the dates of the transfers, which was in line with § 428.044.3, RSMo 2000. Her argument regarding the flow and transfer of cash to Janette through Clark Drilling was addressed in Point I, and will not be repeated here, but also leads to the denial of this point.

*Point V—Trial court erred in holding that Clark Drilling assets owned by Janette*

In Point V, Wilda contends that the trial court erred in holding that the assets (as opposed to the stock) of Clark Drilling were owned by Janette. Wilda argues that this holding misapplied and misconstrued corporate law on the subject. In addition, Wilda asserts that this finding fostered the use of Clark Drilling as Robert's alter ego and allowed Robert, Janette, and Clark Drilling to benefit from the fraudulent transfers of the stock.

We agree with the respondents that there is no substantial difference between this point and Point III. Therefore, we will not repeat the analysis here. Point V is denied.

*Point VI—Fraudulent transfer of Robert's salary should extend beyond December 1997*

In Point VI, Wilda argues that the trial court erred in failing to award her damages for the fraudulent transfer involving the shifting of Robert's salary to Janette beyond December 1997. In Wilda's view, the evidence showed that Robert continued to work within Clark Drilling at least through 2001.

 We agree with Wilda that the evidence was clear that Robert's status in and work involvement with Clark Drilling did not change on October 17, 1996, and any assertion that he retired on that day was false. However, there was conflicting evidence as to his intention to retire, including a recommendation from a doctor to do so, and when he reached a point of no longer having any substantial involvement in the operations of the corporation. It was for the trial court to judge the credibility of the witnesses and assign weight to their testimony and evidence. We must defer to it on this point. Point VI is denied.

*Point VII—Trial court erred in valuation of corporation and stock*

Here, Wilda contends that the trial court erred in applying a minimal value to the valuations of Clark Drilling and the stock

and in awarding her a resulting minimal value. She argues such valuations were against the weight of the evidence.

 Weimer and Compere testified to very different valuations. The trial court made it clear in its findings that it believed Compere and assigned more weight to the testimony and evidence he presented, as "[h]e kn[e]w their overall financial situation better than anyone." This was a credibility issue on which we defer to the trial court. Point VII is denied.

*Point VIII—Attorney's fees and punitive damages*

 In her final point, Wilda argues that the trial court erred or abused its discretion in refusing to award her any attorney's fees or punitive damages in connection with her claims. We agree with Wilda that cases involving fraudulent transfers allow for the award of both attorney's fees and punitive damages. *Volk Constr. Co. v. Wilmescherr Drusch Roofing Co.*, 58 S.W.3d 897, 901 (Mo.App.2001). However, as is highlighted in the case Wilda cites, the trial court is afforded discretion to determine the correct circumstances under which to render such awards. *Id.*

 Regarding punitive damages, they "must in general bear some relation to the injuries and the manner of their infliction." *Id.* Further, Wilda is correct that punitive damages are not precluded by the Uniform Fraudulent Transfer Act under which she brought her claims. *Id.* As for attorney's fees, "absent statutory authorization or contractual agreement each litigant must bear the cost of its own attorney's fees." *Id.*

Given the circumstances of this case, the trial court did not abuse its discretion in failing to award either punitive damages or attorney's fees. Point VIII is denied.

**Conclusion**

The judgment is affirmed.

BARNEY, P.J., and GARRISON, J., concur.