

# In the
# Missouri Court of Appeals
# Western District

KEVIN M. HIGGINS AND SUE E. HIGGINS, )
)
)   WD78327
Appellants, )
)
)   OPINION FILED:
v. )   November 17, 2015
)
ABIGAIL J. FERRARI AND EMMITT F. SMITH, )
)
)
Respondents. )

**Appeal from the Circuit Court of Cass County, Missouri**
The Honorable R. Michael Wagner, Judge

Before Division Three:  Joseph M. Ellis, Presiding Judge, Karen King Mitchell, Judge
and Gary D. Witt, Judge

Appellants Kevin Higgins ("Kevin")[1] and Sue Higgins (collectively "the Higginses") appeal the trial court's entry of judgment on all counts in favor of Respondents Abigail Ferrari ("Abigail") and Emmitt Smith ("Smith" and collectively the "Respondents").  The Higginses claim that the Respondents conspired with Tony Ferrari ("Tony") to fraudulently transfer money received from the Higginses to a bank account

---

[1] Because Respondents Kevin and Sue Higgins and Respondent Abigail Ferrari and Tony Ferrari share the same surnames, we address them by their first names throughout the opinion.  No familiarity or disrespect is intended.

controlled by Respondents, thereby placing those assets out of the reach of the Higginses in their attempts to satisfy their claims against Tony.

The Higginses raise three points on appeal. The Higginses argue that the trial court's judgment erroneously declared and applied the law and was against the weight of the evidence regarding their claims for fraudulent transfer and civil conspiracy to commit fraud. We affirm.

## FACTUAL BACKGROUND[2]

This case arises out of the failed construction of an out building by Tony for the Higginses. Sometime in 2000 or 2001, Kevin was driving near his home and saw a steel building that was similar to one that he wanted constructed on his property. Kevin received a referral from the owner of that building to Tony, who had constructed it. Tony began erecting steel buildings in 1982 and started his own business in 1989. By the time of these events, he had erected approximately two hundred steel buildings.

Plans to construct the Higginses' building did not begin in earnest until the Summer of 2002. Kevin initially wanted to construct a building that was three hundred feet long, in which he could board and train horses. However, Tony's estimate for the cost of a building this size was too expensive for the Higginses, so Tony was asked to reconfigure the bid for a smaller building. Tony normally purchased the materials for the buildings he would erect from a company called Worldwide Buildings ("Worldwide"),

---

[2] This court accepts as true the evidence and inferences favorable to the trial court's judgment and disregard contrary evidence. *Stander v. Szabados*, 407 S.W.3d 73, 78 (Mo. App. W.D. 2013).

but even the reconfigured smaller building was larger than those manufactured by Worldwide.[3]

Tony, therefore, sought bids from another company, Colonial Buildings ("Colonial"), and contacted his stepfather, Smith, who was also in the construction trade, to obtain a bid from Alliance Steel Building Systems ("Alliance"). The bid from Alliance was significantly lower than the bid Tony received from Colonial. Tony could not directly order a building from Alliance because he was not an Alliance dealer. Smith, however, was able to obtain the building due to a previous business relationship with Alliance. Up to the time of trial, this was the only building Tony ever purchased through Smith in all the years he had been working to erect steel buildings.

Tony contacted Kevin and informed him of the estimate for a 168 foot long building from Alliance. Higgins agreed to provide a $10,000.00 deposit to hold the price for the building. Kevin gave Tony a $10,000.00 check for the deposit, payable to Tony Ferrari, which was endorsed by Tony and his wife, Tammy, and deposited into Tammy's bank account. Although it is unclear from the record, there appears to have been a transfer of $5,000 from this payment into Respondents' Account from which Alliance was paid a $4,000 deposit on the building. This issue does not need to be resolved for purposes of this opinion.

In early August of 2002, Tony provided Kevin a written contract for the construction of the building. According to the terms of the contract, the total price of the

_____

[3] The suppliers of these types of buildings have sets of plans for various size buildings and when the purchaser orders a particular building, the supplier sends the plans and all of the materials necessary to construct the building ordered. It is up to the purchaser to then construct the building from the plans and materials provided.

3

building was $182,163.00. Less the $10,000.00 deposit previously conveyed, the remaining balance on the contract was $172,163.00 to be paid in three installments. The first payment of $60,257.00 would be paid as a down payment. The second payment of $86,081.55 would be due at the time of delivery of the building materials and would be paid in two installments of $78,340.00 and $7,741.55. Finally, the last payment of $25,824.45 would be made when the building was completed.

Tony received two checks from the Higginses at issue in this litigation; the first check he received on September 3, 2002 in the amount of $60,257.00 and the second check on October 9, 2002 in the amount of $78,340.00. Rather than deposit these checks into his wife's account, as he had done with the original $10,000.00 deposit, these two checks were deposited into a bank account owned by Abigail, Tony's mother. This account was an account previously used by Abigail and Smith as a business account ("Respondents' Account")[4].

Tony testified that he deposited the funds into Respondents' Account because he was having marital issues, and Tony and the Respondents wanted to make sure that the building being purchased from Alliance would be paid for, as Smith was the person ordering the building from Alliance and would be liable for the costs. The total amount actually deposited into Respondents' Account was $135,597.00.[5]

Abigail drafted a check out of Respondents' Account for $76,630.00 and delivered it to Alliance, at which time the remaining balance owed to Alliance on the building was

[4] The account was in Abigail's name but Smith also had check-writing authority on the account. Accordingly, we will refer to it as Respondents' Account.
[5] This amount is less the $3,000.00 cash withdrawal Tony took from the September 3 check, which never went into Respondents' Account.

4

paid in full. There is no dispute that Alliance was paid in full and there is no dispute that all the building materials for the project were delivered to the Higginses' property. The dispute between the Higginses and the Respondents pertains to the funds remaining in the Respondents' account, which totaled $58,987.00. Apart from payment to Alliance for the building, the evidence shows that the following sums were subsequently withdrawn from the Respondents' Account:

- $6,000.00 paid to Colonial for doors for the building that were purchased from Colonial rather than Alliance;

- $2,500.00 paid to Tony with a note indicating it was used for payroll;[6]

- $17,000.00 paid to Tony with a note indicating it was used for building materials;

- $660.32 paid to United Rentals;

- $1,285.70 paid to Case Credit Corp. for equipment used for the building;

- $2,500.00 paid to Smith as commission for obtaining the building from Alliance;

- $825.28 paid to Smith to reimburse his expenses for a trip to Oklahoma to the manufacturer's building site to exchange wrong parts which had been shipped for the building.

---

[6] There does not appear to be evidence in the record to support the trial court's finding that this sum was spent for payroll for employees working specifically on the Higginses' building. This is inconsequential, however, as we find that in circumstances of this case that the additional sums returned to Tony count towards the "value" he received for the transfer of the checks at issue.

5

The trial court found the evidence presented by Tony was credible and that these amounts were all spent on the Higginses' building project. The total of these expenditures was $30,771.30. The total from the amounts above when added to the price paid to Alliance for the building out of Respondents' Account was $111,401.30.[7] Therefore, subtracting this amount from the total deposited for this project into Respondents' account ($135,597.00) leaves a balance of $24,195.70. An additional $27,300.00 was paid out of the Respondents' account by additional checks made payable to Tony.[8]

Tony and his crew of employees started work on the building for the Higginses slowly, constructing piers that had to be installed prior to the erection of the building. Kevin became dissatisfied with the pace of work. Tony testified that he and his crew were constructing three buildings at the same time due to the approaching winter and progress on the Higginses' building was slow. On January 6, 2003, Tony and Kevin had a final meeting at which there was a confrontation. Tony testified that he felt threatened and that he was fired from the job.

On January 22, 2003, Kevin brought suit against Tony and Smith. On July 17, 2003, the lawsuit against Smith was dismissed and Kevin obtained a consent judgment against Tony in the amount of $85,000.00. That judgment remains unsatisfied.

On September 30, 2004, the Higginses filed a lawsuit against Smith and Abigail in which they alleged, as relevant here, that Smith and Abigail acted in concert with Tony in furtherance of a conspiracy to hinder, delay, and defraud Tony's creditors. After the

---

[7] This amount includes the $4,000 deposit to Alliance that came out of Respondents' Account.
[8] As explained supra, additional funds from the initial $10,000 deposit seem to have been deposited into Respondents' Account as the $4,000 deposit to Alliance on the building was written from Respondents' Account prior to the delivery of the two checks at issue in this case.

refusal of the trial court to allow the Higginses to amend their Petition to add additional claims, the Higginses dismissed their petition against Abigail and re-filed a separate petition against Abigail. The first case against the remaining defendant Smith and the new case against Abigail were subsequently consolidated into one action from which this appeal arises.

The consolidated case asserted numerous claims against Smith and Abigail. The claims relevant to this appeal are Counts I and II, which asserted against both Abigail and Smith, claims for Fraudulent Transfer. The Higginses alleged that the transfers by Tony of the checks for $60,257.00 (Count I) and $78,340.00 (Count II) to the Respondents' Account were fraudulent to the Higginses because the transfers were made with the intent to hinder, delay, or defraud Tony's creditors or were constructively fraudulent. Also relevant to this appeal is Count III, asserted against Abigail, for Civil Conspiracy to Commit Fraud. The Higginses alleged that Abigail conspired with Smith and Tony to induce the Higginses to purchase the building.

A bench trial was conducted for which evidence was taken by the trial court over approximately seven separate days over the course of over three years. Each party submitted proposed findings of fact and conclusions of law. The trial court adopted the Findings of Fact and Conclusions of Law submitted by the Respondents and entered judgment in favor of the Respondents on all counts. The Higginses now appeal.

## STANDARD OF REVIEW

This appeal is from a bench-tried civil case, the standard of review for which is firmly established.

7

The standard of review for a bench-tried civil case is that set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). This court will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or misapplies the law. *Id.* We view the evidence and the reasonable inferences that may be drawn therefrom in the light most favorable to the judgment, disregarding evidence and inferences to the contrary. *Id.* "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Id.* "We defer to the trial court's determination of the credibility of the witnesses." *River Oaks Homes Ass'n v. Lounce,* 356 S.W.3d 855, 859 (Mo. App. W.D. 2012).

*Stander v. Szabados*, 407 S.W.3d 73, 78 (Mo. App. W.D. 2013).

## ANALYSIS

## POINT I (ACTUAL FRAUD)

In Point One on appeal, the Higginses argue that the trial court erred when it entered judgment against them in favor of Respondents on their fraudulent transfer claims because the court erroneously declared the law, erroneously applied the law, and the judgment was against the weight of the evidence[9] because the evidence at trial established that the transfers made by Tony to Abigail were made with the actual intent to hinder, delay, or defraud his creditors and Abigail did not receive the transfers in good faith for reasonably equivalent value. Accordingly, the Higginses argue the transfers were fraudulent and voidable pursuant to the Missouri Uniform Fraudulent Transfer Act ("MUFTA").

---

[9] In all three points on appeal, the Higginses' appellate brief combines into the same point relied on a substantial evidence challenge, a misapplication-of-law challenge, and an against-the-weight-of-the-evidence challenge. These are distinct claims and must appear in separate points relied on to be preserved for appellate review. *See* Rule 84.04; *Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014). This Court will gratuitously address the merits of the Higginses' claims.

8

"To set aside a transfer as fraudulent under MUFTA, it is necessary to show that the transfer was made with an intent to hinder, delay, or defraud creditors." *Birkenmeier v. Keller Biomedical, LLC,* 312 S.W.3d 380, 389 (Mo. App. E.D. 2010); *see also* Section 428.024. "The burden of proof is on the creditor, and fraud is never presumed when the transaction may be fairly reconciled with honesty." *Bueneman v. Zykan*, 52 S.W.3d 49, 54 (Mo. App. E.D. 2001) (citing *Nance v. Nance*, 880 S.W.2d 341, 346 (Mo. App. E.D. 1994)). The burden is on the plaintiff to prove intent to defraud and it must be shown by clear and convincing evidence. *Birkenmeier*, 312 S.W.3d at 389. However, intent to defraud is often difficult to prove by direct evidence. *Id.* Therefore, Missouri courts may look to a number of "badges of fraud" to infer intent to defraud from the factual circumstances. *Id.*; *see also First Home Savings Bank v. C&L Farms, Inc.*, 974 S.W.2d 621, 625-26 (Mo. App. S.D. 1998) ("Missouri courts are willing to look to 'badges of fraud,' which may be considered to determine the presence of fraud, since they are items which so frequently attend conveyances to hinder, delay or defraud creditors").

In Missouri, the badges of fraud include: (1) a conveyance to a spouse or near relative; (2) inadequacy of consideration; (3) transactions different from the usual method of transacting business; (4) transfers in anticipation of suit or execution; (5) retention of possession by the debtor; (6) the transfer of all or nearly all of the debtor's property; (7) insolvency caused by the transfer; and (8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious. *Taylor v. Clark*, 140 S.W.3d 242, 251 (Mo. App. S.D. 2004). Section 428.024.2 has also codified eleven "factors" that may

be considered in determining actual intent under Section 428.024.1.[10] That section provides as follows:

> In determining actual intent under subdivision (1) of subsection 1 of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Section 428.024.2. For a court to find that the transfer was fraudulent, several badges of fraud must be shown. *Birkenmeier*, 312 S.W.3d at 389. However, even where a transfer is found to be fraudulent as to a creditor under Section 428.024.1, the transfer is not voidable "against a person who took in good faith and for a reasonably equivalent value [. . .]" Section 428.044.1.

The trial court found that the transfers of the two checks in question were not made to hinder, delay or defraud creditors. Rather, the court found that there was a "valid reason" for the transfers. The court accepted as true the testimony that Tony was required to purchase the metal building through Smith because Tony did not have access to the necessary supplier. The two checks were deposited into Respondents' Account to ensure that the full costs of the building would be paid, which it was. The outstanding

---

[10] All statutory references are to RSMo 2000 cumulative currently supplemented, unless otherwise noted.

cost of the building, after the initial $4,000.00 deposit, was $76,630.00. The first check deposited into Respondents' Account, less the $3,000.00 Tony took out as cash, was $57,257.00, which did not cover the entire purchase price of the building but left approximately $19,373.00 outstanding. The second check deposited into Respondents' Account for $78,340.00 which was enough to cover the outstanding cost of the building. The court thus found that there was a "valid reason" for the transfers of the two checks into Respondents' Account.

The Higginses argue the trial court ignored evidence of actual fraud. They cite testimony by Tony that the reason he did not have his own personal checking account was in order to avoid creditors. While it is true that Tony did testify that he had not maintained his own bank accounts for a significant amount of time in order to avoid creditors, he did not testify that in this instance the transfer of these checks into the Respondents' Account rather than his own accounts was intended to avoid them. Tony testified that rather than deposit this check into his wife's checking account, as he had done previously, he deposited these checks with Respondents to make sure that Alliance was paid for the purchase of the building, an amount for which Smith would have been liable had Alliance not been paid in full. In addition, both Abigail and Smith testified at trial that Tony's transfers of the two checks in question were made for the purpose of purchasing the Higginses' building from Alliance. Using the Respondents' Account was not a regular practice by Tony to avoid creditors; Respondents' Account was only used for this one business arrangement in which Smith purchased the building on Tony's behalf. The trial court did not ignore direct evidence of actual fraud but found that the

11

reasons provided by Tony, Abigail, and Smith for the deposit of the checks into the account were credible and the transfers were not made with the intent to defraud creditors.

The Higginses also argue that the "badges of fraud" analysis conducted by the court was flawed. Regarding the badges of fraud, the trial court found that while the transfers were made to a near relative, there was a valid reason given for the transfers. In addition, the court found that Tony received adequate consideration for the transfers as all the funds were either used to (1) pay for the Higginses' building or (2) returned back to Tony.[11] Further, although this was an unusual transaction for Tony, the court believed, as explained *supra*, that there was a valid reason for these unusual transactions; i.e., to ensure that Smith was able to pay Alliance for the building he agreed to order on Tony's behalf. The court found that the transfers were not made in anticipation of suit or execution as, at the time of the transfers, the project was proceeding as planned. Finally, the court found there was no evidence that the transfer of the checks consisted of all of Tony's property or how much other property Tony owned.

The Higginses contest each of these findings and argue that the facts tell a different story. They argue that the transfers were made to Tony's mother, who is an insider, and the transfers were unknown to the Higginses. Also, they argue that the transfers were made after Tony had an outstanding judgment against him by another creditor and, given that he did not have any other accounts or assets in his name, these

---

[11] For further discussion regarding whether reasonably equivalent value was exchanged, see Point Two on appeal.

12

transfers accounted for substantially all of his assets and he was insolvent after the transfer. Finally, the Higginses argue that Tony did not receive reasonably equivalent value for the transfer of the two checks.

The version of the facts the Higginses implore us to adopt ignores our standard of review as the trial court did not find credible the testimony upon which this version of the facts must rely. The Higginses' argument also appears to misunderstand the nature of the "badges of fraud" inquiry. The actual question before the trial court is whether the transfers were made with the "intent to hinder, delay, or defraud creditors." *Birkenmeier*, 312 S.W.3d at 389. Because fraudulent intent can be difficult to prove by direct evidence, the "badges of fraud" inquiry allows a trial court to examine the factual circumstances surrounding the transfer so that it may conclude that the transfer was actually made with the requisite fraudulent intent. The "badges of fraud" inquiry is only a tool that the trial court may use to try to reach the underlying relevant inquiry - fraudulent intent. *See id.* ("Fraudulent intent is rarely proven by direct evidence; thus, it is acceptable in Missouri courts to determine the presence of fraud by considering particular badges of fraud"); *see also* Section 428.024.2 ("*In determining actual intent under subdivision (1) of subsection 1 of this section, consideration may be given*, among other factors [ . . . . ]") (emphasis added).

Although the presence of several badges of fraud gives rise to the presumption that the transfer was fraudulent, even the presumption may be rebutted if the transferor can provide evidence that the transfer was not made for the purpose to hinder, delay or defraud creditors. *See Taylor*, 140 S.W.3d at 251. There is nothing in statute or case law

that requires that the trial court find fraudulent intent where a certain number of "badges of fraud" are present. Rather, the trial court may use a "badges of fraud" inquiry to help it determine whether fraudulent intent was present. Here, the trial court heard the evidence, judged the credibility of the witnesses, and concluded that that the transfers were made for a valid business reason and that the requisite fraudulent intent had not been proven. As explained above, there was substantial evidence to support the trial court's conclusion that the transfers were in fact made for a valid business purpose.

The fact that Tony owed other creditors at the time he made these transfers and had an outstanding judgment against him does not automatically result in a finding that, in this instance, the transfers of these checks were fraudulent. Evidence at trial showed that Tony had operated his business for a significant amount of time before the underlying events in this case and Tony continued to build forty additional buildings for other customers after his dealings with the Higginses. While the evidence showed Tony was past due in paying other creditors during this time, the evidence did not conclusively prove that Tony was insolvent and did not establish that Tony would have been unable to complete the project had there not been a dispute with the Higginses over the pace at which the construction of the building was progressing. The trial court considered the badges of fraud and was ultimately persuaded by the credible evidence that the transfers were not made with fraudulent intent but for a valid businesses purpose. Contrary to the Higginses' assertion, the trial court correctly stated the law and applied it appropriately to the facts the court found credible.

14

Our standard of review requires that we view the facts in the light most favorable to the trial court's verdict and accept as true evidence and inferences favorable to the trial court's judgment while disregarding contrary evidence. *Stander*, 407 S.W.3d at 78. The trial court's finding that there was a valid business reason for the transfers of the two checks into Respondents' Account was supported by substantial evidence and not against the weight of the evidence. Accordingly, the trial court did not err in finding against the Higginses on their fraudulent transfer claims alleging actual fraud.[12]

Point One is denied.

## POINT II (CONSTRUCTIVE FRAUD)

In Point Two on Appeal, the Higginses claim the trial court erred when it entered judgment against them on their fraudulent transfer claims because the trial court erroneously declared the law, erroneously applied the law, and its decision was against the weight of the evidence in that the Higginses presented clear and convincing evidence that Tony made transfers to Abigail without receiving reasonable equivalent value in exchange for the money and, therefore, the transfers were fraudulent under MUFTA.

---

[12] The trial court found that Abigail's only involvement with the case was to make sure Alliance was paid in full for the building. In addition, the trial court found that Abigail never made any misrepresentations or committed any unlawful intentional acts against the Higginses. She returned the excess funds deposited into Respondents' Account back to Tony to whom the funds belonged. There was no evidence the deposit of these checks into the Respondents' Account were part of a scheme to avoid Tony's creditors but were made only to ensure that Smith was able to pay for the building. Although not explicit, the facts as set out in the judgment and the court's findings as to credibility lead to a conclusion that the Respondents acted in all times in good faith. As discussed in Point Two on appeal, we also find that Tony received reasonably equivalent value for the transfers of the two checks at issue. Therefore, pursuant to Section 428.044.1, the transfers were not voidable as to the Respondents because they took the transfers in good faith and for a reasonably equivalent value. Pursuant to Section 428.044.1, "[a] transfer or obligation is not voidable under subdivision (1) of subsection 1 of section 428.024 [actual fraud] against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." *See also State ex rel. Mo. Highway & Transp. Comm'n v. Overall*, 53 S.W.3d 222, 226 (Mo. App. E.D. 2001) ("pursuant to section 428.044(1), a transferee may defeat a fraudulent conveyance claim brought under section 428.029(1) by demonstrating that he took in good faith and paid a reasonably equivalent value for the property").

15

As opposed to actual fraud, a creditor may also prove "constructive fraud" under Section 428.024.1(2). Rather than considering whether the debtor had an "intent to defraud", constructive fraud looks to the underlying economic circumstances to determine whether a particular transfer is injurious to a creditor. *See* 37 AM. JUR. 2D *Fraudulent Conveyances and Transfers* § 7 (database updated August 2015). Under the constructive fraud theory, a transfer made by a debtor is fraudulent to a creditor if the debtor made the transfer (1) "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" and (2) the debtor either (a) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or (b)" [i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." Section 428.024.1(2).

Section 428.019.1 defines "value" for the purpose of MUFTA as follows: "Value is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied [ . . . . ]" MUFTA does not specifically define "reasonably equivalent value." Whether reasonably equivalent value has been received by the debtor is a fact intensive inquiry that looks to the substance of the transaction. 37 AM. JUR. 2D *Fraudulent Conveyances and Transfers* § 25 (database updated August 2015).

The Higginses argue that the only "value" Tony received from the transfers of the funds to Respondents' Account was the value of the building from Alliance, which was $80,630.00 out of the total $135,597.00. The Higginses ignore that the funds over and

16

above the purchase price of the building were either used for the project or returned to Tony. They argue that when funds are transferred by a debtor to a transferee and subsequently transferred back without consideration, then the transfer lacks reasonably equivalent value. In support of this principle, the Higginses cite *In re Roti*, 271 B.R. 281, 295 (Bankr. N.D. Ill. 2002). In *Roti*, the bankruptcy court recognized that the Bankruptcy Code does not define "reasonably equivalent value," so the court uses the following factors to determine what is a reasonably equivalent value: "(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee." *In re Roti*, 271 B.R. at 295. The question is one of fact and there is no fixed formula for determining reasonable equivalence. *Id.* The determination turns on the facts of each case. *Id.* The *Roti* court, citing a Seventh Circuit decision, *In re Carlson*, stated that the receipt of funds for a debtor by a transferee and subsequent transfer back to the debtor without consideration paid by the initial transferee lacks reasonably equivalent value. *Id.* (citing *In re Carlson*, 263 F.3d 748, 750 (7th Cir. 2001)). A review of *In re Carlson*, however, does not persuade us that the same rule should be followed in the specific circumstances of this case.

In *In re Carlson*, the debtor in a bankruptcy case challenged the court's denial of discharge of his debts. 263 F.3d at 749. In that case, the debtor, a few months before declaring bankruptcy, entered into a "practice merger agreement" with a fellow lawyer, Lawyer B, which purported to merge their practices. *Id.* Pursuant to that agreement and after he declared bankruptcy, a contingency fee owed to the debtor from a settlement

17

arrived by check written to Lawyer B. *Id.* Lawyer B subsequently transferred funds back to the debtor and the debtor's designees. *Id.* The court found that the "agreement" was obviously made in contemplation of impending bankruptcy and was a transparent effort to conceal assets from the bankruptcy court. *Id.* at 750. Accordingly, the court held it was "a transfer made without consideration and with intent to defraud [debtor lawyer's] creditors, and thus a fraudulent conveyance and indeed one involving both constructive and actual fraud." *Id.* The facts in *In re Carlson* distinguish it from the facts in the case at bar.

As recognized by *Roti* and *Carlson*, whether reasonably equivalent value has been exchanged is a highly fact sensitive matter and depends on the specific circumstances of the transaction. This is not a situation where funds were transferred without consideration and then transferred back to the transferor for the specific purpose to avoid creditors. The trial court here found the opposite; that the transfers were made for a legitimate business purpose. While intent to defraud is not necessary to find liability for constructive fraud, the intent of the parties is relevant as it bears on the underlying question of whether reasonably equivalent value was exchanged. *See e.g., In re Roti*, 271 B.R. at 295 (factor to be considered in whether reasonably equivalent value was exchanged is good faith of the transferee). The checks at issue here were deposited into the Respondents' Account so that Smith could pay Alliance for the building and all remaining funds were spent on building supplies, services for the project, or disbursed back to Tony. Nothing was retained by Respondents and there is no evidence that Respondents held the funds on Tony's behalf to help him avoid creditors.

18

As stated previously, constructive fraud is concerned with the underlying economics of the transaction to determine whether a transaction effectively undermined the position of creditors. "If the debtor's net worth is maintained, creditors cannot challenge a transfer as constructively fraudulent." 8A C.J.S. *Bankruptcy* § 692; *see also See* 37 AM. JUR. 2D *Fraudulent Conveyances and Transfers* § 7 (database updated August 2015); *In re Gerdes*, 246 B.R. 311, 313 (Bankr. S.D. Ohio 2000) ("If the debtor's net worth is maintained, its creditors cannot complain of the transfer*"); In re Jeffrey Bigelow Design Grp., Inc*., 956 F.2d 479, 484 (4th Cir. 1992) ("[T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred"); *In re Johnson Bros. Truckers Inc.*, 9 Fed. Appx. 156, 165 (4th Cir. 2001) (same); *In re Congrove*, 222 Fed. Appx. 450, 454 (6th Cir. 2007) (same).

The facts show that the two transfers at issue deposited $135,597.00 into Respondents' Account. From that amount, Respondent's paid Alliance $80,630.00 for the building. Smith was paid a total of $2,500.00 as a commission for his purchase of the building from Alliance for Tony and there was evidence that this was a reasonable commission price. In addition, Smith was reimbursed $825.28 for costs he expended travelling to Oklahoma for Tony due to the need to exchange parts for the Alliance building. The amount of $6,000.00 was paid to Colonial for doors to be used on the building, which were delivered to the Higginses. The amount of $17,000.00 was taken

19

from the account by a check which indicated it was for building materials and testimony also supported that the amount was used for building materials on this project. A company called United Rentals was paid $660.32 for a crane to take materials off the Higginses' property. The amount of $1,285.70 was paid to Case Credit Corp for the use of a rental machine for the Higginses' job. The amount of $2,500.00 was written by check to Tony indicating that it was used for payroll. Finally, a number of additional checks were written to Tony for unknown reasons totaling $27,300.00.

The trial court found Tony

> received adequate consideration for the deposits in that other than the money he received back, all the other payments were for his benefit, including, of course, the building he was constructing for the Plaintiffs. Although the transaction was not made in the usual method of transacting business, the testimony of Tony Ferrari was credible that this was an unusual transaction for him because of the size of the building that required him to obtain the building from a source other than his normal supplier.

In effect, Tony was repaid any excess value over and above the cost of the building that the Respondents received. After these transactions, Tony's financial position was the same as it had been prior to the transactions. Constructive fraud is concerned with the underlying economic realities of the situation. The underlying reality here is that the position of Tony's creditors was not undermined as the result of these transfers. Because we find that Tony received reasonably equivalent value for the transfer of the checks in question, it is unnecessary to proceed further. Accordingly, the trial court did not err in entering judgment against the Higginses on their fraudulent transfer claims based on their theory of constructive fraud.

Point Two is denied.

20

## POINT III

In Point Three on Appeal, the Higginses argue that trial court erred in entering judgment in favor of Respondents on the civil conspiracy to commit fraud claims because the court erroneously applied the law to the facts and the judgment was against the weight of the evidence because the evidence admitted at trial established that the Respondents and Tony engaged in civil conspiracy to commit fraudulent transfers. On appeal, the Higginses claim that clear and convincing evidence at trial proved that Smith and Abigail conspired to commit fraudulent transfers to the detriment of Tony's creditors.

A claim for civil conspiracy is not a separate and distinct cause of action but acts to hold conspirators jointly and severally liable for some underlying act. *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012). "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff." *Id*. (internal citation and quotation omitted). "To state a claim for civil conspiracy, Appellants must establish the following: '(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) the plaintiff was thereby injured.'" *Mika v. Cent. Bank of Kansas City*, 112 S.W.3d 82, 93 (Mo. App. W.D. 2003) (quoting *Phelps v. Bross,* 73 S.W.3d 651, 657 (Mo. App. E.D. 2002)).

> To establish a claim for civil conspiracy, the proof must be "such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." There must be clear and convincing proof that the alleged conspirator "knowingly performed any act or took any action to further or carry out the unlawful purposes of the conspiracy." In addition and by its

21

nature, a conspiracy has as its object or purpose the obtaining of a benefit for the conspirator.

*Mika*, 112 S.W.3d at 93 (quoting *Preferred Physicians Mut. Mgmt. Grp. v. Preferred Physicians Mut. Risk Retention*, 918 S.W.2d 805, 815 (Mo. App. W.D. 1996)).

This point can be dispensed with immediately as the Higginses' claim on appeal is based solely on the assertion that the Respondents conspired to commit fraudulent transfers. As we have found the trial court did not err in finding that there was neither actual fraud nor constructive fraud to support the Higginses claims for fraudulent transfer, there is no underlying unlawful act or tort to support a civil conspiracy claim. *See Hamilton v. Spencer*, 929 S.W.2d 762, 767 (Mo. App. W.D. 1996) ("Civil conspiracy is not itself actionable in the absence of an underlying wrongful act or tort").

Point Three is denied.

## CONCLUSION

For the reasons stated herein, the judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur

22