IN RE the MARRIAGE OF Kent A. SIVILS and Patricia J. Sivils.

Kent A. Sivils, Petitioner/Appellant,

v.

Patricia J. Sivils, Respondent/Respondent.

No. SD 34633

Missouri Court of Appeals, Southern District, Division Two.

Filed: September 12, 2017

---

Appellant's Attorney: C. Brandon Stafford, of Ozark, Missouri.

Respondent's Attorney: Ann R. Littell Mills, of Springfield, Missouri.

WILLIAM W. FRANCIS, JR., J.

Kent A. Sivils ("Husband") appeals the "Judgment and Decree of Dissolution of Marriage" ("Judgment") entered by the trial court.[1] In two points on appeal, Husband asserts the trial court erred in failing to make a proper division of marital property. Finding no merit to Husband's claims, we affirm.

**Factual and Procedural History[2]**

We recite the facts of this matter in accord with the principle that we view the facts in the light most favorable to the judgment. We credit all evidence and reasonable inferences in favor of the judg-ment, and disregard unfavorable facts and inferences. *Landewee v. Landewee*, 515 S.W.3d 691, 694 (Mo. banc 2017).

Husband and Patricia J. Sivils ("Wife") were married on March 16, 1996. Two children were born of the marriage: daughter K.M.S., now age 20, and son C.A.S., now age 15.

After leaving the Navy, Wife[3] obtained a radiology license and began employment at Ferrell-Duncan Clinic in Springfield as an x-ray mammographer in 1994. As of 2015, her yearly income was $59,633.00. Through that employment, Wife contributed to a retirement account with a balance of approximately $195,000.00, at the time of trial.

Husband held various jobs during the marriage, including auto body work, and heating and air conditioning work. At the time of trial, he was doing auto body work and had been employed for a year and a half. His wages for 2015 totaled $38,064.69.

In the course of the marriage, Husband displayed bellicose and violent behaviors toward Wife. On at least two occasions, Husband hit Wife. Husband would go on "verbal rampages" against Wife, often in front of the children. In such instances, the children would become scared, run to their

---

1. Our use of the term "trial court" is meant to represent the proceedings conducted before Family Court Commissioner John P. Luka-chick ("Commissioner") on August 1, 2016, whose findings were subsequently adopted by the Circuit Court of Greene County on August 2, 2016.

2. We note Father's brief fails to comply with Missouri Court Rule 84.04 and that this failure constitutes grounds for dismissal. Rule 84.04(c) provides, "The statement of facts shall be a fair and *concise* statement of the facts *relevant* to the questions presented for determination without argument." (Emphasis added). "These requirements regarding the statement of facts section of an appellant's brief serve to define the scope of the contro-versy and afford the appellate court an immediate, accurate, complete, and unbiased understanding of the facts of the case." *Stickley v. Auto Credit, Inc.*, 53 S.W.3d 560, 562 (Mo. App. W.D. 2001). Nevertheless, because we are able to sufficiently discern the facts of the case, we grant review *ex gratia*. We emphasize the necessity for counsel to abide by Rule 84.04.

All rule references are to Missouri Court Rules (2017).

3. Wife suffers from a hereditary syndrome called MEN1, which results in tumors in her pituitary system, for which she must travel to and from St. Louis for treatment.

rooms, and put their sheets over their heads. Husband would also berate Wife in public, using coarse and derisive language.

When C.A.S. was two, he began sleeping with Husband and Wife in the marital bed.[4] At this time, Husband was already primarily sleeping in the basement and had "disconnected" himself from the rest of the family. Husband would work out in the garage until the early morning hours and then would "crash out downstairs." When C.A.S. began sleeping in the marital bed, Husband permanently removed himself from the marital bedroom and moved into the basement.

After Husband moved to the basement, he had little contact with the children. He attended very few school events or extracurricular activities, leaving the parenting duties to Wife. Both children were involved in competitive dance, particularly C.A.S. Wife took the children to regular dance practices and competitions. Husband had no substantive involvement with C.A.S., particularly with his dance activities. He also failed to attend parent-teacher conferences and school open houses for C.A.S. Husband also contributed very little to the children's support, leaving Wife the burden of meeting the children's needs. Wife paid, among other expenses, costs associated with the children's health and dental insurance, accidental insurance for C.A.S., and $465.00 per month for C.A.S.'s dance expenses.

In 2010, Husband was involved in a motorcycle accident when he collided with a FedEx truck. Husband sustained scrapes, bruises, and a broken wrist. Husband was released to return to work after a few weeks, but refused Wife's requests do so because he "thought that if he didn't go back to work," they "would get more mon-

ey". From 2010 until 2014, Husband mowed a few lawns, did some side auto body repair work, and received some unemployment funds. Husband kept the money he made from mowing lawns and the auto body repair work for himself, and only deposited the unemployment funds in the couple's joint account.

During this time, Wife was paying all of the household expenses, relying heavily on credit cards at Husband's urging. Husband insisted that once he received a settlement for his accident, the money would be used to pay off the credit cards. Wife incurred substantial credit card debt as a result. Husband also utilized credit cards, but used the cards for personal rather than family expenses. Husband's parents occasionally deposited money into the couple's joint bank account to help with expenses.

In March 2012, Husband settled the personal injury lawsuit arising out of the motorcycle accident, and received net settlement proceeds of $103,076.72. The funds were initially deposited in Husband and Wife's joint account, pending a temporary hold until the funds could be released for joint use by the parties. However, Husband's father persuaded a senior vice president at the bank to remove the hold, and Husband then wrote a check to his mother for $25,000.00, and a check to his father for $50,000.00. Husband's mother in turn wrote a check for $56,000.00, and used it to open a checking account in her name, but the account was for Husband's exclusive use. Husband's purpose in having the account opened was to prevent Wife from having any access to these funds, and so that Husband could conduct whatever financial transactions he wanted without Wife's input or interference.

4. Wife observed that when C.A.S. was in bed with her, Husband would no longer attempt to have sex with her during the night. As a result, she allowed C.A.S. to sleep in bed with her at night from the age of two until C.A.S. was approximately 10 years old.

When Wife discovered that the hold on the account had been surreptitiously lifted and a significant portion of the funds removed, she moved the remaining $23,000.00 to her own separate account. She used those funds for household expenses, and expenses relating to the children.

Because of Husband's actions, in 2012, the parties stopped operating from a joint checking account. Wife provided Husband with a list of expenses relating to the children, and requested Husband's assistance in paying them. Husband refused, and even declined to contribute toward the children's clothes and school lunches. He also decided, after he obtained his settlement, that he would no longer contribute any money toward groceries because Wife and his children "wasted so much food that I—I just couldn't deal with that anymore[.]"

Husband initially paid some marital bills out of the $56,000.00, including mortgage payments on the marital home, utilities, and credit cards. Husband also paid for Wife's car insurance in exchange for Wife keeping Husband on her healthcare insurance. However, at one point, Husband refused to pay the propane bill, and the propane company locked the propane tank, which left the family with only a pellet stove as a source of heat for the entire house.

Husband then squandered a significant amount of the settlement funds on personal entertainment such as online gambling, as well as betting on horse races and football games through a bookie.

Also in 2012, Husband threatened to kill wife. Wife sought an ex parte order of protection, which she subsequently dropped.

After K.M.S.'s graduation from high school, Wife wished to take the children on a cruise. Husband refused to consent and sign the necessary paperwork for the children to obtain passports. He later suggested he would have consented if the children were to "grovel[ ] a little bit."

In February 2014, Husband obtained a check for $1,200.00 from the couple's joint investment account at Edward Jones. The check was payable to Husband and Wife, but Husband forged Wife's signature on the check, and then deposited the check into his separate account on March 4, 2014.

Husband filed for divorce on March 20, 2014. Wife filed an answer and a "Counter Petition for Dissolution of Marriage." Husband subsequently returned to work and was ordered to pay temporary child support in the amount of $665.00 per month for the support of the couple's two children, which Husband did not voluntarily pay so that Wife was forced to garnish his wages.

Soon thereafter, Husband stopped paying the insurance on K.M.S.'s car. He did not inform Wife, but instead texted his daughter, stating: "I hope you're not driving your car, because you don't have insurance on it[.]"

As part of the marital property, Husband and Wife owned a house and real estate they used for rental income. Wife actually acquired this property in 1994, prior to the marriage, but in 2002, added Husband's name to the title of the property when they began using it as rental property. A mortgage remained on the property, which Wife continued to pay. For a time, both Husband and Wife were involved in the rental property. In 2012, after the couple separated their finances, Husband told Wife, "I'm not going back over there. You know what? It's all yours. I'm done[.]" Thereafter, without any help from Husband, Wife made the necessary repairs on the rental property, performed all business matters related thereto, and

continued to pay the mortgage. To do so, Wife borrowed money from her mother. Thereafter, the rental property was sold for approximately $90,000.00. After payment of the existing mortgage, Wife netted the amount of $22,677.62.[5]

In May 2014, Husband repaired the radiator in Wife's car, for which he sent her an invoice for his labor. At the end of the invoice, he handwrote a note: "I want my money. If I don't get it, I will put a hole in your new radiator." Husband subsequently attempted to explain this note by suggesting he performed the work on a Saturday, it was hot, Wife was unable to take the car anywhere else because "they wouldn't do it for free," and "all [Wife] did was pay for the radiator."

Also in May 2014, Husband stopped paying the mortgage on the marital home, but did not tell Wife. He received a delinquency/foreclosure notice from the mortgage company, and a notice to vacate, but again did not inform Wife. In October 2014, Wife learned through a friend at an insurance company that her house had been sold at a foreclosure sale 20 days prior, and that there was a letter of eviction for the family's removal from the marital home.[6]

Unaccustomed to foreclosure and post-foreclosure proceedings, and fearing that her things and those of her children would be put out in the yard if she did not vacate the marital house immediately, Wife quickly found a new place to live, and moved out by November 6, 2014. C.A.S. was devastated when he learned he would have to move from the only home he had known, and that Husband had "never said a word to

him" about it. Wife did all the packing for the move in the evenings after she finished taking the children to their dance activities. Husband did not assist at all in this endeavor. When Wife and the children moved, Husband again gave no assistance, and Wife was forced to rely on friends to move the family's belongings.

Husband remained in the marital house for several more months without making any payments or arrangements for his continued occupancy of the home. In December 2014, an unlawful detainer action was filed against both Husband and Wife for Husband's continued occupancy of the house. Despite Husband being served with this action, which listed Wife also as a defendant, Husband did not inform Wife. Wife was never personally served, and when she learned of the action, incurred attorney's fees defending herself even though she had vacated the house.

Since 2014, Husband removed himself entirely from C.A.S.'s life. Husband spent between two and three minutes a month with C.A.S., and texted him approximately once a month. In November 2014, the guardian ad litem requested Husband attend a dance performance in which C.A.S. was participating. Husband watched one dance, and then left. C.A.S. looked for Husband as soon as he was done dancing, but Husband had already left.

A two-day trial commenced on May 31, 2016. On August 2, 2016, the trial court entered its "Judgment and Decree of Dissolution of Marriage." The trial court awarded the parties joint physical custody of the children, with Wife having sole legal

5. Wife requested the trial court set these proceeds aside due to Husband's previous mishandling of marital funds related to the proceeds of his personal injury settlement. The trial court heard evidence on the matter, and agreed that the $22,677.62 should be held in an escrow account by Wife's attorney.

6. The foreclosure had a significant negative impact on Wife's credit, and she has since encountered substantial difficulty in obtaining new lines of credit.

custody and Wife's address designated for mailing and educational purposes. Husband was awarded parenting time with the children per the trial court's parenting plan. Husband was to pay the sum of $778.00 per month for child support for both children until K.M.S. became emancipated, at which time he would then pay the sum of $633.00 per month for C.A.S. The child support included court-ordered extraordinary costs for the children of $465.00 per month.[7]

The trial court awarded to Wife non-marital furniture and personal property in the amount of $761.00; the children's furniture and personal property in the amount of $400.00; and marital property in the amount of $231,078.14.[8] The trial court ordered Wife to pay marital debt in the amount of $73,058.88.[9]

The trial court awarded to Husband non-marital furniture and personal property in the amount of $3,286.00. Husband was awarded marital property in the amount of $6,525.00, and was ordered to pay $30,775.82 of the marital debt.[10]

The trial court acknowledged that the division of property and debt weighed in favor of Wife, but that

> having considered all relevant factors including, but not limited to, the specific factors as set forth herein the [c]ourt does find that the division of property and debt ... is fair and equitable under the circumstances of this case. Frankly, [Husband]'s treatment of his wife and children both emotionally and financially is one of the more severe cases of such conduct this [c]ourt has witnessed.

Husband filed a motion for rehearing and a motion to amend judgment, both of which were denied. This appeal followed.

In two points on appeal, Husband argues:

I. THE TRIAL COURT ERRED IN ENTERING JUDGMENT DIVIDING THE MARTIAL PROPERTY AND AWARDING ABOUT 95.5% OF THE ASSETS TO RESPONDENT WHICH RESULTED IN A POSITIVE NET AWARD OF ABOUT $167,918 TO HER AND A NEGATIVE NET AWARD OF ABOUT <$20,076> TO PETITIONER BECAUSE THE COURT IS REQUIRED TO DIVIDE THE MARITAL PROPERTY AND DEBT AS DEEMED JUST AFTER CONSIDERING ALL RELEVANT STATUTORY FACTORS, INCLUDING THE ECONOMIC CIRCUMSTANCES OF EACH SPOUSE AND THE CONTRIBUTION OF EACH SPOUSE TO THE ACQUISITION OF THE MARITAL PROPERTY, IN THAT THE JUDGMENT DOES NOT CONSIDER THE ECONOMIC CIRCUMSTANCES FACTOR INCLUDING THE IN-

---

7. Husband does not contest the award of child support as part of this appeal.

8. Wife was awarded 97 percent of the marital property that included furniture and personal property; the 1996 Pontiac Grand Am, which Wife asserted to be non-marital property and the trial court found to be marital property with a value of $500.00; Wife's Cox pension/retirement account in the amount of $194,951.15; the funds from the sale of the rental property in the amount of $22,677.62; her personal checking account with a $25.00 balance, and four non-negotiated checks from Wells Fargo, State Farm and Edward Jones in the amount of $3,319.37.

9. Wife was ordered to pay 70 percent of the $103,834.70 in marital debt.

10. Husband was awarded 3 percent of the marital property that included furniture and personal property, two vehicles, two motorcycles; a trailer; his personal checking account, and a life insurance policy. Husband was ordered to pay 30 percent of the $103,834.70 in marital debt.

COMES OF EACH PARTY, AS RESPONDENT'S IS MUCH HIGHER, AND IT DOES NOT PROPERLY CONSIDER EACH PARTY'S CONTRIBUTION TO MARITAL ASSETS, INCLUDING PETITIONER'S CONTRIBUTION AND WORK HE DID ON THE RENTAL HOME FOR THIRTEEN YEARS, OR THAT HE FUNDED THE EDWARD JONES ACCOUNT.

and

II. THE TRIAL COURT ERRED IN ENTERING JUDGMENT DIVIDING THE MARTIAL PROPERTY AND AWARDING ABOUT 95.5% OF THE ASSETS TO RESPONDENT WHICH RESULTED IN A POSITIVE NET AWARD OF ABOUT $167,918 TO RESPONDENT AND A NEGATIVE NET AWARD OF ABOUT <$20,076> TO PETITIONER BECAUSE THE COURT IS REQUIRED TO DIVIDE THE MARITAL PROPERTY AND DEBT AS DEEMED JUST AFTER CONSIDERING ALL RELEVANT STATUTORY FACTORS INCLUDING THE CONDUCT OF THE PARTIES IN THAT THERE IS NO CREDIBLE OR SUBSTANTIAL EVIDENCE TO SUPPORT NUMEROUS FINDINGS IN THE JUDGMENT WITH REGARD TO PETITIONER'S CONDUCT, AS FINDINGS SUCH AS SEVERAL YEARS OF UNEMPLOYMENT BEFORE HIS INJURY SETTLEMENT, ONLINE DATING AND PAYMENTS TO ATTORNEY ARE NOT SUPPORTED, AND IMPORTANT EVIDENCE ADMITTED TO BY BOTH PARTIES AS TO PETITIONER'S POSITIVE CONDUCT IS IGNORED INCLUDING HIS CONTRIBUTION OF MOST OF HIS $103,000 INJURY SETTLEMENT TO FAMILY EXPENSES, HIS PAYMENT OF CHILD SUPPORT AND OTHER EVIDENCE, AND ANY MISCONDUCT FOUND DOES NOT WARRANT THE PROPERTY DIVISION, WHICH IS UNREASONABLE AND AN ABUSE OF DISCRETION.

The issues for our determination are:

1. Did the trial court err in dividing the marital assets by failing to properly consider the economic-circumstances factor and the contribution-to-marital-assets factor of section 452.330.1; [11] and

2. Was there substantial evidence to support the trial court findings with respect to Husband's conduct and misconduct?

**Standard of Review**

This Court must sustain the trial court's judgment in a dissolution case unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. This Court accepts as true the evidence and reasonable inferences therefrom in the light most favorable to the trial court's judgment, and disregards all evidence and inferences to the contrary. The burden of demonstrating error is on the party challenging the divorce decree.

The trial court has broad discretion in identifying, valuing, and dividing marital property. This Court will interfere with the trial court's distribution of marital property only if the division is so heavily

---

**11.** All references to statutes are to RSMo as amended through 2016, unless otherwise indicated.

weighted in favor of one party as to amount to an abuse of discretion.

*Landewee*, 515 S.W.3d at 694 (internal quotations and citations omitted).

## Analysis

### *Point I: Economic Circumstances and Contributions Factors*

In his first point, Husband argues that the trial court erred in dividing the marital property, in that the trial court failed to properly consider: (1) the economic circumstances of each spouse, and (2) the contribution of each spouse to the acquisition of the marital property. For ease of analysis, we address these factors out of order.

As an initial matter, we note that Husband's first point and companion argument fail to properly classify their purported grievances into *one* of the standards for reversal in a court-tried case: that there was a lack of substantial evidence, the judgment was against the weight of the evidence, or the court erroneously declared or applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Husband argues at times that the trial court erred because the judgment was "so heavily weighted in [Wife]'s favor"; at other times because many of the trial court's findings "are not supported"; and still at other junctures, that the trial court erroneously applied the law because it "failed to consider important and statutorily required factors[.]"

 The standard of review in civil cases contemplates two types of arguments regarding the factual basis for a trial court's judgment: a challenge that the decision is not supported by substantial evidence, and a challenge that the decision is against the weight of the evidence. *Houston v. Crider*, 317 S.W.3d 178, 186–87 (Mo. App. S.D. 2010). To present an argu-

ment that the judgment is not supported by substantial evidence, the appellant must complete three steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,

(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

*Id.* at 187. To present an argument that the judgment is against the weight of the evidence, the appellant must complete four steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Id.* Where, as here, the appellant fails to follow this mandatory framework, the appellant's argument is "analytically useless and provides no support" for his challenge. *Id.* at 188.

Further, as our supreme court has indicated:

[W]hether a judgment is against the weight of the evidence is a separate question from whether it is supported by substantial evidence, and that both arguments may not be combined in a single point because they rely on inconsistent premises: the argument that a judgment is against the weight of the evidence presupposes that there was substantial evidence but it was outweighed.

*Pasternak v. Pasternak*, 467 S.W.3d 264, 270 n.4 (Mo. banc 2015). "Joining those two claims together in a single point ... preserves nothing for appellate review." *In Re Marriage of Chorum*, 469 S.W.3d 484, 487 (Mo. App. S.D. 2015). Similarly, a misapplication-of-the-law challenge must also appear in a separate point relied on to be preserved for our review. *Higgins v. Ferrari*, 474 S.W.3d 630, 635 n.9 (Mo. App. W.D. 2015). Husband's argument combines all three of these distinct arguments under the umbrella of a single point relied on. As such, his argument is wholly unpreserved.

Even if Husband's argument were preserved, his argument would be unavailing because it fundamentally misapprehends the nature of the section 452.330.1 factors. Section 452.330.1 governs the distribution of property in a dissolution case, and provides that the trial court "shall set apart to each spouse such spouse's nonmarital property and shall divide the marital property and marital debts in such proportions as the court deems just after considering all relevant factors[.]" These factors are:

(1) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children;

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage; and

(5) Custodial arrangements for minor children.

Section 452.330.1. The statutory factors of section 452.330.1 are not exclusive, and the trial court has the discretion to look beyond these factors in arriving at an appropriate division. *Finch v. Finch*, 442 S.W.3d 209, 215 (Mo. App. W.D. 2014). The trial court must arrive at a division that is fair and equitable under the circumstances of the case, and not simply divide the property equally between the spouses where such division does not comport with the former standard. *Landewee*, 515 S.W.3d at 694. "[T]he trial court is permitted to attach any amount of weight it deems appropriate to the individual factors." *Crews v. Crews*, 949 S.W.2d 659, 665 (Mo. App. W.D. 1997). We begin with the presumption that a division of property is correct, and it is Husband's burden as the party challenging the division to overcome that presumption. *Landewee*, 515 S.W.3d at 694.

With respect to the section 452.330.1(2) factor, considering the respective contributions of each spouse, Husband points to various pieces of evidence, suggests that the trial court should have credited each piece of evidence, and then argues that on that basis, the trial court should have awarded him more property in the division. It is true that the trial court is required to "consider" certain factors based on section 452.330.1. However, Husband's argument runs afoul by presupposing that in "considering" those factors, the trial court is required to give credence

to *any* evidence or testimony imputed by those factors. This is not so. Only evidence *credited* by the trial court is evidence which must be considered in the context of the section 452.330.1 factors. On appeal, we view the evidence—and the inferences reasonably available therefrom—in the light most favorable to the trial court's judgment. We disregard all evidence and inferences contrary to the judgment. *Landewee*, 515 S.W.3d at 694. Husband's argument completely fails to account for our standard of review in the context of section 452.330.1, and is therefore unavailing.

Further, Husband's "divide and conquer" approach to the section 452.330.1 factors, analyzing the evidence as to individual factors in isolation rather than as a whole, misapprehends the nature of the non-exclusive, multi-factor test under section 452.330.1. As our Western District accurately noted in an attempt by another appellant to challenge a section 452.330.1 distribution by challenging the trial court's treatment of a factor individually:

> [R]egardless of the weight the trial court did assign to the issue of the parties' respective marital contributions, this is but one factor that is weighed with the other four factors in the § 452.330.1 analysis. Thus, we cannot say that the trial court's division of property failed to adequately consider factor (2) of § 452.330.1 as appellant contends.

*Crews*, 949 S.W.2d at 665.

As *Crews* indicates, even if the trial court did fail to appropriately consider one of the factors, Husband's task on appeal would be to show how the trial court could not have come to the distribution that it did in light of all the credited evidence as to the section 452.330.1 factors the trial court could have considered, and any credited evidence as to extrinsic factors that the trial court could have chosen to take into account.[12] Husband's argument fails to do this.

Husband's argument as to the economic-circumstances factor fares no better. Husband argues, for instance, that the trial court's distribution is in error because: "[i]t appears [Wife]'s economic circumstances are better than [Husband]'s. The factor favors [Husband] and the trial court did not consider it." This line of argument completely fails to consider our standard of review. Again, only *credited* evidence must be considered in the context of the section 452.330.1 factors. *Landewee*, 515 S.W.3d at 694. Husband makes no attempt to distinguish between evidence the trial court credited, which we must consider, and evidence the trial court did not credit, which we must ignore. Further, Husband fails to confine his argument to *one* of the exclusive avenues for challenging a civil court-tried case: not supported by substantial evidence, against the weight of the evidence, or erroneously declares or applies the law. *Higgins*, 474 S.W.3d at 635 n.9. Husband's argument, to the extent it can be *ex gratia* curatively interpreted into either a substantial-evidence challenge or an against-the-weight-of-the-evidence challenge, fails to follow the mandatory analytical sequence set forth by *Houston*, 317 S.W.3d at 186–87. Finally, as discussed earlier in this opinion, Husband's treatment of this section 452.330.1 factor in isolation, rather than in the context of all the 452.330.1 factors, along with the extrinsic factors the trial court expressly did or implicitly could have considered, renders

---

12. We note that this principle represents the general rule for how section 452.330.1 factors interact with the evidence on review; we do not intend to suggest that there are no, more specific, exceptions to this principle. However, as no such exceptions are applicable here, we need not expound further on that issue.

his argument unavailing. *See Crews*, 949 S.W.2d at 665.

We note that even if we were to take the thrust of what we discern to be Husband's argument and apply it more properly within the bounds of Rule 84.04, our standard of review, and principles of appellate review, Husband's challenge would still fail. The gist of Husband's argument is that the property division unduly favored Wife, and that the trial court reached that errant outcome by failing to properly consider the evidence in context of the section 452.330.1 factors.

The judgment indicates that the trial court "considered all relevant factors, including, but not limited to, the specific factors set forth herein." The trial court acknowledged that it was awarding the "lion's share" of the marital assets to Wife, but was doing so because this was "fair and equitable under the circumstances of the case." In doing so, the trial court took explicit consideration of the following,[13] in relevant part:

- Husband was unemployed for many years, and as a result, the parties incurred significant credit card debt for day-to-day living expenses during this time;

- In March 2012, Husband received settlement proceeds in the net amount of $103,076.72 in relation to a motor vehicle accident in which Husband was involved. The funds were marital assets:

 - Husband wrote a check to his mother for $25,000.00 from this settlement;

 - Husband wrote a check to his father for $50,000.00 from this settlement;

- On March 28, 2012, Husband's mother opened a bank account, in her name only, with an initial deposit of $56,000.00. Husband had his mother open the account for the purposes of keeping Wife from accessing these marital funds. Husband was a signatory on the account, and had unrestricted access to those funds; Husband's mother did not use the account, made no withdrawals from the account; and Husband had exclusive access;

- Wife had no access to those settlement funds, nor the account opened by Husband's mother;

- Husband used the funds from his mother's account for legitimate reasons for a short time, and then for "repeated and ongoing" utilization of the funds for trips to the racetrack in Hot Springs, Arkansas, online dating services, online gambling, and payments to Husband's attorneys in the matter of his divorce from Wife;

- From the time Husband and Wife "ceased to stay in the same bedroom" until the time of trial, Husband contributed very little to the support of the children;

- Wife incurred expenses on behalf of the children without contribution from Husband;

- After the date the parties separated, Husband withdrew funds from a retirement account without the knowledge or consent of Wife; Husband forged Wife's signature on the proceeds check in order to access the funds without Wife knowing.

Further, we must presume that the trial court credited the remaining evidence in the record favorable to the distribution in

---

13. We note that Husband challenges that some of these findings are unsupported by the record; however, due to analytical defects in Husband's argument, we need not resolve those questions for purposes of this appeal.

the context of the remaining section 452.330.1 factors, along with the extrinsic factors the trial court could have considered. *Landewee*, 515 S.W.3d at 694; *Crews*, 949 S.W.2d at 665. Such evidence in this case includes:

- In 2012, Husband stopped assisting with the couple's rental house, in matters such as fixing things that needed to be repaired, or in collecting rent;

- Husband stopped paying the mortgage on the couple's marital home without telling Wife, resulting in damage to Wife's credit, and Wife and children's unexpected move from the marital home;

- Husband had not attended a parent-teacher conference or picked up his children from school in the previous five years;

- In May 2014, Husband replaced a radiator on Wife's car; he sent her an invoice stating, "I want my money. If I don't get it, I will put a hole in your new radiator";

- Husband had, on numerous occasions, berated Wife in front of the children, using foul and derisive language;

- Husband had been physically violent toward Wife, and Wife had previously filed an ex parte action against Husband when he threatened to kill her;

- Husband had not been a substantive part of the children's lives, and had left the lion's share of the couple's parenting duties to Wife;

- Wife suffers from a hereditary syndrome called MEN1, which results in tumors in her pituitary system, for which she must travel to and from St. Louis for treatment.

For all of these reasons, Husband fails to convince us there was insufficient evidence to support the trial court's distribution, or that the distribution was against the weight of the evidence, or that the trial court committed any error of law. Point I is denied.

### Point II: Husband's Conduct and Misconduct

In his second point, Husband argues that the trial court erred in that there was "no credible or substantial evidence to support numerous findings" regarding Husband's negative conduct, and that the trial court wrongfully ignored evidence of Husband's positive conduct.

To the extent Husband challenges the credibility determinations of the trial court, we wholly reject his argument. Our standard of review dictates that we defer to the trial court on matters of credibility. *Landewee*, 515 S.W.3d at 694.

The remainder of Husband's second point suffers from the litany of analytical defects we discuss *supra* with respect to Husband's first point. We confine our commentary to the brief observations that: (1) Husband fails to follow the mandatory analytical sequence set forth by *Houston*, 317 S.W.3d at 186–87, for a substantial-evidence challenge, rendering his argument analytically useless; and (2) Husband's treatment of this section 452.330.1 factor in isolation, rather than in the context of all the 452.330.1 factors, along with the extrinsic factors the trial court expressly did or implicitly could have considered, renders his argument unavailing. *Crews*, 949 S.W.2d at 665. Point II is denied.

The judgment of the trial court is affirmed.

NANCY STEFFEN RAHMEYER, C.J., P.J.—Concur

DANIEL E. SCOTT, J.—Concur